# W. R. EDMONS v. STATE.

No. A-1930.   Opinion Filed June 14, 1913.

(132 Pac. 923.)

1. **EVIDENCE—Character.** As a general rule, evidence as to the bad character of a defendant is not admissible unless he first offers evidence as to his good character; but this rule does not apply to cases in which character is an element of the offense upon trial.

2. **APPEAL—Ground for Reversal.** Courts are established for the sole purpose of enforcing justice, punishing criminals, and suppressing vice, and, when the guilt of a defendant is clearly established, a conviction should not be reversed, except for fundamental errors.

3. **PROSTITUTION—Pandering—Sufficiency of Evidence.** For facts sustaining a conviction for pandering, as defined by section 2425, Rev. Laws 1910, see evidence and opinion.

(Syllabus by the Court.)

*Appeal from Superior Court, Pottawatomie County;*
*G. C. Abernathy, Judge.*

W. R. Edmons was prosecuted in the superior court of Pottawatomie county, charged with the offense of pandering. He was found guilty by the jury, and his punishment was assessed at three years' imprisonment and a fine of $300, and he appeals.   Affirmed.

The evidence in the case was as follows:

Sylvia Sekavec testified that she was 17 years old; that she had lived in Shawnee 12 years; her father was a carpenter, but was afflicted with rheumatism; that she went to school until she was past 16, and thereafter she was a waiter in private families in Shawnee; that about July 25th she became acquainted with Josephine Pyentka, a Bohemian girl; that on August 25, 1912, she was staying with her sister, Mrs. Pruitt, in Shawnee; that she first became acquainted with defendant Edmons at the Saddle Rock Hotel in the

city of Shawnee about August 25th; that Josephine Pyentka's
parents lived in Denver, Colo.; that the two wanted to go to Den-
ver; they did not have money enough to go on; though Jose-
phine's parents had sent her a ticket, the two decided to dress
in boy's clothes and "bum" their way on a freight train to
Denver; that they had only one boy's suit; that she left her
sister's about August 20th or 21st; she says, "We didn't
know what to do; we didn't have but one suit of clothes,
and didn't know where we could get any, and so we went
to Woodland Park and then to the high school and sat on the
steps, and we didn't want to go back to my sister's and I had
$1.50"; that they decided to go to the Saddle Rock Hotel
for the night; didn't know what kind of a place the Saddle
Rock Hotel was; had never been there; went there about 11:30
at night; saw Mr. Fowler and the defendant, Edmons, the
latter sitting near the desk upstairs; paid for the room one
night; she registered as Mary Sullivan and Josephine registered
as Joe Clark, because they had never been to a cheap board-
ing house and didn't want anybody to know they had been
up there, and expected to leave next morning; the defendant
showed them to the room; did not give them any key to lock
the door; that next morning the pocketbook and dollar were
gone; they complained to defendant, who called Mr. Hopkins
and Mr. Fowler, who looked for the money; said nothing like
that had happened before, but did not find the money; de-
fendant told them if they did not have any money they
could get their breakfast in the kitchen; that Fowler, Hop-
kins, and defendant, Edmons, took them to the kitchen; that
after breakfast Hopkins said "he had a nice little cook he
wanted us to get acquainted with, and said he would bring
her in and let her talk to us; she come in and said she had
heard we lost our money and said she was awful sorry";
the cook was Rena Beck; the conversation was in the presence
of Fowler, Hopkins, defendant, and Rena Beck; Hopkins
and Fowler went out after Rena Beck; that Hopkins and

Fowler gave them as their breakfast what they had left; after this they went to Rena Beck's room; that Rena Beck, Hopkins, Josephine, and witness were in Rena Beck's room; stayed there about half an hour; that Rena Beck said there was a sick lady there who would like to see the witness and Josephine, and told them the sick lady was Mrs. Edmons, the wife of the defendant; they went to Mrs. Edmons room and found the defendant there; Hopkins was with them; they talked for a while in there; that "they all wanted us to stay there";' that day they stayed there until about dinner time and told them they were going to look for work; that they got a Shawnee News-Herald and looked through the advertisements; did not find any work, but went back to the Saddle Rock; that they saw Edmons and his wife; that Rena Beck told them she "would stand good for our room" that night; that Mrs. Edmonds was present; so said Hopkins. Further she testified that Rena Beck and Mrs. Edmons told her that her (Mrs. Edmons') husband "would make dates" for her (witness); that Mrs. Edmons was present; that Rena Beck said Fowler, the night clerk, would keep watch; "and so the girls would have to pay 50 cents or the boy 25 cents and the girl 25 cents;" that she did not at the time know what that meant. The witness goes into detail about the conversation; that protection from the officers would be afforded them; that "Rena Beck said we would make good money if we stayed there"; that the second night they were at the Saddle Rock Hotel defendant and Curt Leonard made dates for witness and defendant's wife, which were fulfilled; that the same night Josephine and Rena Beck were going until about 11:30; that defendant, Hopkins, Fowler, and Mrs. Edmons were afraid Rena Beck had been caught; that Rena Beck had been drunk several times; that during the time she was at the Saddle Rock she saw men going to Rena Beck's room, one at a time; Rena Beck played the French harp, danced and sung; that witness smoked cigarettes with them; that the morning she went away, defendant and all asked her to come

back.    On  cross-examination  she  said  she  registered  at  a hotel  in  Oklahoma  City  under  the  name  of  Sylvia  May, without  the  surname;  paid  75  cents  for  her  room;  at  the  time she  came  to  Oklahoma  City  she  was  staying  at  the  county attorney's  house  in  Shawnee;  came  to  Oklahoma  City  and  was in  charge  of  the  police  matron  in  Oklahoma  City  when  Chief Hawk  of  Shawnee  came  after  her;  that  she  was  at  the  Broadway  Central  Hotel  in  Oklahoma  City;  that  she  did  not  tell Mrs.  Bartell  that  she  stayed  in  a  house  on  East  Grand  avenue  while  in  Oklahoma  City;  that  when  arrested  in  Shawnee she  told  the  officers  she  was  22  years  old,  because  the  defendant,  his  wife,  and  Leonard  told  her  to  do  so;  that  she had  never  had  illicit  relations  prior  to  going  to  the  Saddle Rock;  that  she  did  not  tell  the  defendant  and  others  at  the Saddle  Rock  that  she  was  a  lewd  woman;  that  she  never went  in  an  automobile  with  Pike  Baker  until  after  she  went to  the  Saddle  Rock.    On  redirect  examination  witness  testified that  she  went  to  the  "stomp  dance"  with  defendant,  his  wife, and  Curt  Leonard,  and  this  was  after  she  went  to  the  Saddle Rock;  that  she  had  three  "dates"  out  there;  that  she  left the  Saddle  Rock  on  the  22d  or  23d  and  went  to  the  American Rooming  House;  that  Edmons,  Rena  Beck,  and  Fowler  got into  a  fuss  about  something,  and  that  she  and  Josephine  went to  the  American  Rooming  House;  that  Leonard  and  defendant went  too;  that  they  stayed  at  the  American  Rooming  House until  Sunday  night,  when  they  were  arrested;  that  Leonard, Mr.  Edmons,  and  Mrs.  Edmons  told  her  to  say  she  was Leonard's  wife;  that  a  raid  was  made  the  second  day  she was  there,  and  Fowler  told  them  to  go  down  the  back  stairway.

Josephine  Pyentka  testified  that  she  was  18  years  old; was  born  in  Bohemia;  came  to  the  United  States  when  she was  10  years  old;  lived  in  Topeka  first,  in  Shawnee  7  years; that  her  parents  had  moved  from  Shawnee  to  Denver,  but wanted  her  to  stay  at  Shawnee  and  earn  some  money;  that she  worked  for  Mrs.  Butts  and  Mrs.  Carson  in  Shawnee;  had

known Sylvia Sekavec about two months; knew defendant first at the Saddle Rock Hotel; that she and Sylvia went there to get a room; that they were going to "bum" their way to Denver wearing boy's clothes; that they had only one suit of boy's clothes, that they walked around awhile, around the high school, and then went to the Saddle Rock Hotel about 12 o'clock; saw Fowler, Rena Beck, and defendant sitting out in front upstairs; got a room; paid 50 cents for it; that Sylvia registered them as Joe Clark and Mary Sullivan; that next morning they told Hopkins the money was gone; first told Edmons; that they were breakfasted in the kitchen; that Hopkins and defendant said they had a little cook they would like for witness and Sylvia to meet, and they brought the "little cook" to the kitchen, who was Rena Beck; that defendant was there; after breakfast they went to Rena's room; that defendant was in the room; Rena said witness and Sylvia could make money, as much as $5 a day; that Fowler would keep watch; that "dates" would be made by Fowler and Edmons; that afternoon she saw men up there; one was drunk; he went to Rena's room; defendant was up there; Rena played the French harp; Hopkins, Fowler, Leonard, Sylvia, and the witness and another man were there; that Rena "played and danced and jigged" and the men sang; that that night Fowler made a "date" for her and for Rena and the witness; that a policeman was on duty, and the dates at the hotel were not filled; that the next day Edmons and his wife, Leonard, Sylvia, and witness left; that they went to the American Rooming House; that the second morning Sylvia said a policeman was coming and Sylvia, witness, Edmons, Mrs. Edmons, and Leonard went down the back stairs; after they went to the American Rooming House they went back to the Saddle Rock; that "Curley," who stayed at the Saddle Rock, came after them; stayed at the Saddle Rock two nights the second time; saw Rena Beck and Fowler there; on Sunday following Rena Beck and witness went to Benson Park; stayed there till about 11 o'clock at night;

went back to the Saddle Rock; that Fowler made the "dates"; that a raid was made Sunday night; she had a "date" made by Fowler; that Edmons and defendant made "dates" for her during the time she was at the American Rooming House; that she paid Fowler for making "dates"; that she was never before in a house of ill fame. On cross-examination she testified that she went to the Saddle Rock with Sylvia; intended to go to Denver Wednesday or Thursday; did not want to go alone; that her mother, whom she had not seen for about three months, sent her a ticket; that at the Saddle Rock Sylvia told her about becoming a lewd woman; this was after she lost the pocketbook; that Rena Beck told them about "making money" and staying there; that the time she, Pike Baker, Louis Smith, and Sylvia went in the automobile was before they went to the Saddle Rock, three weeks before. The witness as to details corroborated Sylvia Sekavec.

J. S. Spann testified that he was assistant chief of police of Shawnee; was acquainted with general reputation of the Saddle Rock rooms; that they had the reputation of being a house with lewd women in it; that just prior to August 25th he raided the place and found men and women there; that the reason he did not find them together was because Fowler had "tipped them off"; that he saw defendant there several times; that he bore the reputation of being a frequenter of bawdyhouses; that Mattie Edmons, wife of defendant, had the general reputation of being a prostitute; that Rena Beck had the same reputation; that Curley Edwards and Fowler who stayed at the Saddle Rock bore the reputation of being frequenters of bawdyhouses; that he saw Fowler almost every night when it was not raining at the foot of the stairs, "standing there looking around."

C. F. Cottrel testified that he was a plainclothes man, on the police force in Shawnee; that defendant had the reputation of "doing the pimping for his wife"; that he knew Curley Edwards, who stayed at the Saddle Rock and who had the reputation of being a frequenter of bawdyhouses; that Mrs.

Edmons, wife of defendant, lived there and had the reputation of being a prostitute; knew Rena Beck, who lived at the Saddle Rock and who had the same reputation.

John Lane testified that his wife was the owner of the Saddle Rock; that he knew its general reputation prior to August 25th, and that "it was pretty bad." On cross-examination defendant's counsel went into detail as to that reputation and was informed that it was a "first-class bawdyhouse"; that he had brought suit for damages to the house by employing it for such purposes.

C. C. Hawk testified that he was chief of police; that up to two months prior to August 25th the Saddle Rock bore a good reputation; after that time its reputation was bad; that he knew defendant and defendant's wife; that she had the reputation of being a prostitute; that he knew Curley Edwards, whose reputation as a frequenter of bawdyhouses was bad; that he knew Rena Beck, whose reputation was that of a prostitute; knew defendant, saw him at the Saddle Rock.

Henry Leeman testified that he was chief of police of Marietta during March, 1912; saw Rena Beck there; that her reputation as a prostitute was bad.

Rena Beck testified that she was acquainted with Edmons, the defendant, Fowler, Hopkins, Sylvia Sekavec, and Joe Pyentka; that about 12 or 1 o'clock she first saw Sylvia and Josephine; they came to the Saddle Rock and wanted a room; that witness was on that night "keeping books"; that Edmons' wife was sick; that Josephine registered as Joe Clark; Sylvia under another name, which she did not remember; that she could hear Josephine and Sylvia in their room "black-guarding and cursing and going on," and saw them smoking cigarettes; next morning she saw the girls in the kitchen; that this was after the girls lost the dollar; that Hopkins informed witness of the fact; that witness, Josephine, Sylvia, Mrs. Edmons, and Edmons, the defendant, were in Mrs. Edmons' room; that one said Pike Baker was her sweetheart

and the other did not give her sweetheart's name; that they both had grass burs on the back of their clothes; that Sylvia got some cigarette papers out of her stocking and some tobacco and smoked; that they told witness they were lewd women and wanted to stay there at the Saddle Rock; that witness told them that Fowler would not allow them to do that; that the girls went downstairs, came back about night, stayed all night, and the next day "he run them off and told them they could not stay there"; that she did not tell the girls they could stay there and make money; that Edmons did not tell the girls he would make "dates" for them; that she did not tell them that Fowler would make "dates" for them, nor that Fowler would watch and see they were not arrested, nor that the girls would have to divide the money; that after they left Josephine came back and begged Fowler to let her stay; that Fowler agreed if she would be a "nice girl" she could come back and he would pay her $3 a week to help witness; that she promised; that Fowler had been helping with the work; that the morning witness prepared breakfast for the girls Fowler was not there and did not come to the hotel until about noon. On cross-examination she testified that she had been married twice; did not know where Beck was; had married him on April 18th; had lived with him at Tribbey; did not go with him to Marietta; that in the preliminary and in the trial the day before she did not say anything about Josephine and Sylvia smoking, cursing, etc., because she was not asked about that; that Mr. Fowler told the girls they could stay the second night if they had any money; that on Sunday she and Josephine went to the park about dark; that two men came up and talked to them; that Josephine and one went "off up to a swing"; did not know either of the men; talked to them about two hours; that she did not see Spann making a raid one night; that she lived at Leon, near Marietta, six months; that she was arrested in a man's room in a rooming house in Marietta; that a police-

man persuaded her to put the man's clothing on, so she would not be bothered if found in the room.

Mrs. Mattie Edmons testified that she was the wife of defendant; first saw Josephine Pyentka and Sylvia Sekavec at the Saddle Rock about 12 o'clock one night; that she (witness) was sick that night; the next day the girls and Rena Beck came in her room; that the girls said they were broke, were lewd women, and wanted to stay there and make some money; that this was said by Sylvia; that Rena Beck told them they could not do that; that Mr. Fowler would put them out; that Sylvia took a sack of tobacco and cigarette papers out of her stocking and smoked; that she and Josephine turned around and asked Rena to brush the "grass and stuff off her back"; that they had been out riding with their sweethearts the night before in an automobile; that Rena told Mr. Fowler about the conversation and that Fowler told them they would have to leave, and they passed her room, went downstairs, and came back late in the evening; that they spent the night there and next morning Mr. Fowler told them they could not stay, "and so they left again"; that they went to the American Rooming House; that witness did not tell them they could stay there, nor did she tell them Fowler or Edmons would make "dates" for them; that at the American she heard the girls say they had "five dollar dates at the Eagle Hall"; that Josephine, Sylvia, Curt Leonard, defendant, and witness went to the American; that Leonard occupied the room with Sylvia; that they stayed about a week there; that Josephine occupied the same room with Sylvia and Leonard; that at the American she (witness) was arrested; that Sylvia gave gave her name as Sylvia Leonard. On cross-examination she testified that she had never been a prostitute; that she went to the American because Dr. Bradford told her she had to have fresh air; that she walked to the American and occupied a room adjoining the room of Sylvia and Leonard's; that Saturday night witness and Edmons, Sylvia, and Leonard went to the "Indian stomp dance"; that the

night (Sunday) they were arrested they were preparing to go to Oklahoma City.

Mrs. Mary E. Bartell testified that she was police matron in Oklahoma City; that Sylvia Sekavec was brought to the police station the latter part of August.

Defendant offered to prove that Sylvia said she had been out on East Grand avenue, and made a statement as to her lewd conduct there. That the girl was being held for an officer from Shawnee.,

M. A. Fowler testified that he saw Sylvia and Josephine at the Saddle Rock; that he was in charge of that place; that the girls came in the night something after 12 o'clock; that they paid for a room; next morning they complained they had lost some money; that Hopkins told them if they would go and look for work and could not find any they could come back; that he never told them he would make "dates" for them; that Hopkins was in the real estate business and was manager of the hotel; never made "dates" for Sylvia; did not agree to protect them, nor for them to become inmates of the house, nor to become prostitutes; that the girls went out and came back and told him they found no work; that Rena told him what kind of girls they were; that they stayed another night; that Sylvia did not go buggy riding with Edmons the second night; that Josephine came back in a few days and witness told her he would give her work if she wanted to work and he was to give her $3 a week; did not tell any one he would make "dates" for her; never tried to make "dates" with the girls; that when the girls left he told them he did not want that class of women there; that he told Josephine if she wanted to work and would be a nice girl she could stay. On cross-examination he testified that he had been at the Saddle Rock about two months prior to the time Josephine and Sylvia went there; that he saw Hopkins there; that witness "had been in the same business at Konawa"; that if there had been any cursing and swearing he supposed he would have heard it if it was very loud; that he did not hear any-

thing like that that night; that next morning he was in Mrs. Edmons' room with Hopkins, defendant, and the girls; does not know who left first; did not hear anything about the girls being lewd; did not hear either girl say anything about brushing burs off of her back; that it was in the afternoon Rena told him about the girls being lewd women; that he told Mrs. Edmons and Sylvia to go; that he told Edmons and his wife he would give them 20 minutes to leave there; that after Sylvia came back she told him that she wanted to make some money there; that he told her she could not stay there; but she had no money or place to stay and he let her stay that night; that the second night Josephine and Sylvia went to a show, came back, and he locked them in their room; that he locked Joe up Sunday night for his own protection; that the night Spann came up there Rena Beck's shoes were under his bed; that he did not go into a room and take Josephine Pyentka out of a room; that he does not remember a policeman calling witness' attention to women's apparel in one of the rooms.

Louis Smith testified that he knew Sylvia and Josephine; that he drives Pike Baker's automobile; about four weeks before "this occurrence" and before the girls' arrest he and Pike Baker and the two girls were out riding in Baker's automobile; that this was the only time; that it was the 17th, Thursday.

W. R. Edmons testified that he was acquainted with Josephine and Sylvia; that he thinks they came to the Saddle Rock about August 20th, between 12 and 1 o'clock; that next morning they stopped him in the hall and told him they had lost a dollar and a pocketbook; that he told Hopkins and Fowler and they looked for the money and did not find it; that Hopkins told the girls he would give them their breakfast; that the girls told him (Hopkins) they were strangers; that witness was in the kitchen; that Rena Beck came in there; did not see the girls any more till late in the evening; that he was rooming at the Saddle Rock Hotel with his wife; had

been there about four days; that his wife was sick; had a conversation with the girls in which they said they had dates at the Eagle Lodge Hall and had been up there to fill them; was not in Rena Beck's room at any time with the girls; did not make "dates" for them; did not authorize Rena Beck to tell the girls he would make "dates" for them; that his wife did not go driving with Sylvia and a man the second night the girls were there; saw the girls there the second night; that Sylvia, Leonard, Josephine, Mrs. Edmons, and defendant went to the American Rooming House; that at the Saddle Rock he had paid for a week in advance and he was paid a refund; that Leonard and Sylvia occupied the same room, and were registered as man and wife; stayed there till Sunday; was arrested there; that at the police station Sylvia gave her name as Sylvia Leonard; did not tell her to give her name as Sylvia Leonard; did not try to persuade Sylvia to stay at the Saddle Rock; was a lodger at the Saddle Rock; had nothing to do with it; paid for his lodging. On cross-examination defendant testified that he had come to Shawnee two or three times, the last time about four months before; came from Oklahoma City; "never kept no track" as to how long he was in Oklahoma City; was working for the Grove Construction Company; first came to Shawnee from Texarkana; "did not keep any track" as to how long he was there; does not "take down the names of the different places" he goes; that while he was at the Saddle Rock he was working for the Woods Produce Company; saw the girls when they came about 12 o'clock at night; the next morning they told him they lost a dollar; that witness told Fowler and Hopkins; that he and Hopkins went into the dining room with them; next saw them in the evening; that he does not remember that the girls told him they were lewd women; that he did not remember that Fowler put them out; that Fowler did not give him and his wife 20 minutes to leave there; that the second day after the second night Leonard and witness went to the American, and came back after them; that

he did not make dates for her and his wife; that he had written notes to Josephine in answer to notes from her.

Sam Epperly testified that he lived at Econtuchka; that he saw defendant and his wife at Benson Park July 4th; that he had filled a "date" with Mrs. Edmons that night. Mrs. Mattie Edmons denied the testimony of Sam Epperly.

Henry Leeman testified that Rena Beck pleaded guilty to a charge of prostitution in Marietta.

*W. M. Taylor* and *Baldwin & Carlton,* for appellant.
*C. J. Davenport,* Asst. Atty. Gen., for the State.

FURMAN, J. (after stating the facts as above). This prosecution is based upon section 2425, Rev. Laws 1910, which is as follows:

"Any person who shall procure a female inmate for a house of prostitution, or who, by promise, threats, violence or by any device or scheme shall cause, induce, persuade or encourage a female person to become an inmate of a house of prostitution; or shall procure a place as inmate in a house of prostitution for a female person; or who shall by promise, threats, violence, or by any device or scheme, cause, induce, persuade or encourage an inmate of a house of prostitution to remain therein as such inmate; or, who shall, by fraud, or artifice, or by duress of person or goods, or by abuse of any position of confidence or authority, procure any female person to become an inmate of a house of ill fame, or to enter any place in which prostitution is encouraged or allowed within this state, or to come into this state or leave this state for the purpose of prostitution, or who shall procure any female person, who has not previously practiced prostitution to become an inmate of a house of ill fame within this state, or to come into this state or leave this state for the purpose of prostitution; or shall receive or give or agree to receive or give any money or thing of value for procuring or attempting to procure any female person to become an inmate of a house of ill fame within this state, or to come into this state or leave this state for the purpose of prostitution, shall be guilty of pandering, and upon conviction for any offense under this article shall be punished by imprisonment in the state penitentiary for a period of not less than two years nor more than twenty

years, and by a fine of not less than three hundred dollars and not to exceed one thousand dollars."

It is within the personal knowledge of the members of this court that the above and foregoing section was prepared by Hon. Thomas H. Owen, of Muskogee, one of the ablest and most painstaking lawyers in the state of Oklahoma. At the time of the preparation of this section Mr. Owen had before him the statutes of all of the other states on this subject, and the purpose was to make this section broad enough to entirely cover and include every act which might constitute or enter into what is generally known as pandering, and we think that this is its effect. The purpose of the Legislature in adopting this section was as far as possible to break up and destroy the infamous traffic in female virtue which has assumed such proportions as to become a curse to society, more blasting and blighting than any plague or epidemic could be, more terrible than any black slavery or any other kind of slavery that ever existed in this or any other country has been, more degenerating to the morals and ideals of the nation, and more soul-destroying than all other agencies against decency combined. The Legislature intended, as far as possible, to prevent prostitution from ever becoming a commercialized institution in Oklahoma. This law was passed in answer to the demands of an enlightened and aroused public conscience. While it includes every kind of pandering, yet one of its special purposes was for the protection of young girls of immature years, who through youth and ignorance and want of experience would otherwise be unable to protect themselves and would become the easy victims of the most despicable specimens of humanity.

Counsel for appellant strenuously complained of the fact that the county attorney in his argument to the jury referred to the defendant and those associated with him as a bunch of hyenas and vultures. The only possible objection which can be urged to the language used by the county attorney is that it did not adequately portray the infamy and moral turpitude of the defendant and those acting with him, for as repulsive

as vultures and hyenas are, they do not feed and fatten upon their own kind. The hyena, who has spent the hours of the night in reveling among the graves of the dead and whose jaws are dripping with the putrid gore of carcasses, the vulture, who feeds alone upon filth and carrion, are each and both angels of righteousness compared to the man who enriches himself at the expense of female virtue. The comparison made by the county attorney was a compliment to appellant and an insult to vultures and hyenas, to whom the county attorney owes an apology. The panderer will not hesitate at any means to secure girls upon any false pretenses or misrepresentation, or who when intoxicated or drugged and not in possession of their senses are conveyed to a place for immoral purposes. Prostitution demands youth for its perpetuation. Upon the courts rests the responsibility of seeing that this demand is not supplied, for the law has a conscience as well as a head and hand, and it is the duty of the courts to see that the hand of the law performs those things which the head directs and which the conscience dictates. It is needless for us to discuss the evidence in this case in detail. The truthfulness of the state's testimony was a question for the jury to determine. From the evidence of the state it appears that appellant and some other persons were acting together in a conspiracy organized for the purpose of carrying on the traffic of debauching girls; that to assist them in accomplishing this purpose the prosecuting witness and her companions were robbed of what little money they had and were left in a penniless and destitute condition when they were approached by members of the conspiracy who assumed a friendly feeling for and an interest in the girls with propositions that the girls should lead lives of shame. It was proven by the state that appellant was guilty of the almost inconceivable infamy of making dates for his wife. This evidence was all admissible because it was a part of the general plan or conspiracy in which the appellant and others were engaged and tends to show its true character, and upon the further ground that it tends to show the character

of the house at which the offense is alleged to have been committed.

As a general rule evidence as to the character of a defendant cannot be introduced unless the defendant first introduces evidence of his good character, but this rule does not apply to cases in which the character of the defendant is an element of the crime charged. See *Porter v. State,* 8 Okla. Cr. 64, 126 Pac. 699; *Putman v. State, ante,* 132 Pac. 916. It was therefore a part of the *res gestae* of the case. We have absolutely no doubt of the guilt of appellant under the testimony in this case. Neither does it appear from the record that he was deprived of any substantial or material right. It is therefore not necessary for us to discuss the various technical objections urged in his behalf by his counsel.

When it appears that a defendant is clearly guilty and there are no fundamental errors in the record, this court does not split hairs or make fine-spun distinctions for the purpose of enabling it to turn guilty men loose. This has been our invariable rule from the date of the organization of this court, and, while it has brought forth many bitter criticisms of the court, yet we have steadfastly conformed to it. Courts are established for the sole purpose of enforcing justice, punishing criminals, suppressing vice, and thereby protecting society. The court that does not live up to this ideal should be abolished as an impediment to justice and a menace to the public. On this question we have never had any doubt, and we are glad to note that our course has met with the approval and indorsement of the Legislature of the state, for in section 6005, Rev. Laws 1910, we find the following:

"No judgment shall be set aside or new trial granted by any appellant court in this state in any case, civil or criminal, on the ground of misdirection of the jury or the improper admission or rejection of evidence, or as to error in any matter of pleading or procedure, unless, in the opinion of the court to which application is made, after an examination of the entire record, it appears that the error complained of had probably resulted in a miscarriage of justice, or constitutes a substantial violation of a. constitutional or statutory right."

In *Burns v. State,* 8 Okla. Cr. 554, 129 Pac. 657, in speaking of a kindred offense, this court said:

"The conduct for which appellant has been found guilty should not for one moment be condoned by any court or jury, and a conviction in such case, when supported by the evidence, as is done in this case, should not be set aside, except for the most grave and serious reasons. * * * While it is true that courts should not discriminate in their administration of law as to individuals, yet there are cases where the character and make-up of a defendant, taken with his conduct and acts and his ability and capacity to know right from wrong, show him to be entitled to a less charitable consideration at the hands of the courts than ought to be extended to ordinary individuals. We think that such is the case now before us, and that the verdict and judgment rendered in this case are altogether legal, just, and righteous. It is sometimes said that a fallen woman is the most depraved of created beings, but we think that the man who is responsible for her fall is much the worse demon of the two. Such characters can expect no sympathy or leniency at the hands of this court."

There being no doubt about the guilt of appellant and no fundamental errors appearing in the record, we could not reverse this case without committing a crime against society. Far from having any ground of complaint at the verdict in this case, appellant should be exceedingly thankful therefor, because his punishment was only assessed at three years' imprisonment and a fine of $300, when the maximum punishment of 20 years' imprisonment and a $1,000 fine should have been imposed, for the testimony clearly shows that appellant is a traitor to society and an enemy of the human race. This, in our judgment, amounts almost to a miscarriage of justice, and if this court had the power we would not hesitate for a moment at fixing the punishment of appellant at the maximum of the law, which is 20 years in the penitentiary and a fine of $1,000.

We find no material error in the record. The judgment of the lower court is therefore affirmed.

DOYLE, J., concurs. ARMSTRONG, P. J., concurs in the affirmation.