## GARRETT v. STATE.

No. A-11426. Dec. 19, 1951.

(239 P. 2d 439.)

Jess L. Pullen, Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Lewis A. Wallace, Ass't Atty. Gen., for defendant in error.

JONES, J. The defendant, Frances Garrett, was charged in the district court of Murray county with the crime of murder; was tried; convicted of manslaughter in the first degree; and pursuant to the verdict of the jury was sentenced to serve the minimum term of four years imprisonment in the penitentiary.

The defendant, about 3 o'clock a. m. on September 6, 1949, fired a bullet into Onis Curtsinger from a .38 Smith and Wesson revolver. The bullet struck the deceased in the left part of his chest, which caused his death in just a few minutes.

Mrs. Nell Curtsinger, widow of the deceased, testified that prior to September 5, 1949, she and her husband and four children had lived at Ryan, Oklahoma; that her husband, the deceased, was an oil well driller who was working in the oil field near the town of Davis, but that he returned to their home about once a week, although it varied and sometimes he did not return home but about twice a month; that on September 5, 1949, she and Mrs. Gill, the wife of another oil field worker, came to Davis for the purpose of locating a house in which they could move; that they rented a cabin and waited for their husbands to come in off the oil rig at midnight; that her husband arrived about 12:30 a.m.; that immediately after he arrived she and her husband drove to the home of the defendant, Frances Garrett, down near Cedarvale, which is about four or·five miles south of Davis on Highway 77; that they made the trip for the purpose of seeing the defendant, Mrs. Garrett, about some lies she had been telling

about the witness; that Mrs. Garrett came out and got into the Curtsinger car and after they had fussed for a few minutes the defendant asked her husband, "Curt have you made up your mind what you are going to do?", and that he replied, "Yes, I am going back to my wife and kids."; that when this was said the defendant and deceased walked over to the car of the defendant and sat in the car together for about 30 minutes; that her husband then went into the home of defendant and brought out her purse and handed it to her; that the deceased then came to the Curtsinger car and got under the steering wheel and the defendant got in the car on the other side of the witness; that the witness ordered Mrs. Garrett to get out of the car and let her and her husband go home, but that Mrs. Garrett said she was going with Onis wherever he went; that Onis Curtsinger then started the automobile and they coasted about 100 yards north of the Garrett house where he stopped the car and said he was not going any farther; that the witness and Mrs. Garrett commenced to fuss again over a statement that the defendant said that she had been to Ryan and had talked to the witness about a divorce from the deceased, and the witness denied that defendant had ever come to Ryan and had such a talk; that after the fuss had continued for some time the deceased said, "I have got to go home and get some sleep."; that defendant opened the door and started to get out of the car, and then said she wasn't going home and started to get back in, at which time the witness gave her a push out of the car; that Mrs. Garrett fell to her knees, and when she turned around she had a gun pointed towards the witness and the deceased; that her husband stepped over Mrs. Curtsinger and Mrs. Garrett shot him, and he then knocked defendant down and they scuffled for about five minutes around over the ground before her husband fell over exhausted and died; that she ran to where the parties were scuffling and attempted to take the gun away from the defendant, but was unable to do so; that she and defendant scuffled for several minutes in the loose gravel and both of them sustained scratches and skinned places on their knees; that during the scuffle the defendant fired four more shots from the pistol into the air; that prior to the shooting, during the argument which had been going on for about two hours, the defendant threatened to whip the witness, and after Mr. Curtsinger had stated that he was going back to his wife and children the defendant said, "You better not leave.", and at another time she said, "You are not leaving".

On cross-examination Mrs. Curtsinger testified that when they arrived at the defendant's house the lights were on and she had not gone to bed; that when Mrs. Garrett came to the car the witness said, "We are going to move to Davis. We have got us an apartment.", and that Mrs. Garrett got mad. She denied that the defendant asked them to leave three or four times.

Doctor W. P. Rudell testified that he made an examination of the body of the deceased at the funeral home in Davis on September 6, 1949. His examination disclosed that a bullet had entered the body of deceased about one-half inch to the left of the sternum and about one-quarter of an inch below the nipple, and came out about the same distance up on the body but just under the right shoulder blade, which gave it about 45 degrees to the exit. On cross-examination he said that the point of exit was slightly higher than the point of entry of the bullet.

John Henry Samples, sheriff of Murray county, testified that he was called at his home about 3:00 a. m., September 6, 1949, and informed that a man had been killed near the Price's Falls road. He drove to the place and found the deceased Curtsinger lying at the edge of the road; that after he had examined the body he went up the road toward the home of defendant and met her near her home. He had a conversation with her, in which defendant stated she had shot Curtsinger. In this conversation, which was admitted without objection on the part of counsel for defendant, the sheriff stated that de-

fendant told him the deceased had brought her home from town about 12:00 o'clock; that they talked for a short while and then deceased left to return to town; that about 1:00 a. m. the deceased and his wife drove up to her place and called her and she went to their car; that she got in the Curtsinger car and they all argued for a long time; that Curtsinger and the defendant then got into the Garrett car and talked a little while, after which Curtsinger said, "I am going to take my wife back to town and you have got to go with me."; that all of them then entered the Curtsinger car, with Curtsinger doing the driving, Mrs. Curtsinger in the middle, and the defendant on the outside; that the deceased stopped the car after going a short distance and the argument started again between the two women; that Mrs. Curtsinger shoved her out of the car backwards; that the defendant got up and Mr. Curtsinger knocked her down; that she immediately pulled her gun and shot him; that they had a desperate struggle for quite some time before he fell over dead; that she said she shot her gun empty while they were scuffling. The sheriff further said that he secured the gun from the defendant and examined it. The gun was a .38 Smith and Wesson revolver and had five empty shells in the cylinder. On cross-examination the sheriff testified that he observed Mrs. Garrett's physical condition after daylight; that she had a black eye and appeared to be very sore, her knees were scratched badly and he took her to the hospital where she complained of bruises and sores on her body.

On behalf of defendant, Harry Camp testified that he lived in Russell's Park near the home of Mrs. Garrett; that on the night of the killing they heard the confusion at the scene of the homicide. He was getting up when Mrs. Curtsinger ran to their home and told them her husband had been killed by Mrs. Garrett. He immediately went to the scene of the difficulty and saw Curtsinger's body lying on the ground; there were human tracks all around the body and the gravel was freshly disturbed. The witness found some eye glasses and a pencil at different places on the ground. Other people who lived in the vicinity arrived shortly after he got there. The witness identified a penciled map which he had drawn showing the location of the body with reference to the road. This map was offered in evidence but the court sustained the objection of the state to the admission of this map in evidence, although he permitted the witness to testify concerning the approximate distances between the various objects listed in the map by reference to the map for the purpose of refreshing his memory.

Mrs. Harry Camp, Clabe Russell, Mrs. Clabe Russell, Johnny Wallis, and Mrs. Johnny Wallis, all testified to substantially the same things as testified to by Mr. Camp. In addition the witnesses testified that they saw Mrs. Garrett either that night or the next day and that she was bruised all over. The witnesses who saw Mrs. Garrett and Mrs. Curtsinger the night of the killing testified that both women appeared to have been in an altercation as their clothes were dirty and torn and their knees were scratched, as if they had been in a scuffle.

Doctor W. D. DeLay testified that the defendant was brought to his hospital in Sulphur on or about September 6, 1949, and that he treated her there for bruises and abrasions; that she had some pneumonia; that he X-rayed her body but could find no evidence of fractures.

Mrs. Frances Garrett, the defendant, testified in her own behalf that she had gone to bed the night of September 5th about 12:30; that about 1:00 a.m. Mr. and Mrs. Curtsinger came to her home and called her out of bed; that she got up, dressed and went outside to their car; that she sat on the edge of the seat of the Curtsinger car with her feet on the fender; that they talked about

fifteen or twenty minutes and then she said that she wished they would leave as she had to go to work at 5:00 o'clock that morning; that the deceased and his wife were doing the arguing; that the deceased said, "Let's go get a cup of coffee and talk this thing over."; that he started the motor of his car and then shut his motor off, and the car rolled to the foot of the hill and stopped; that Curtsinger and his wife commenced to argue again, and Mrs. Garrett told them that she was going to get out and go back home; that she opened the car and started to step out, and Mrs. Curtsinger pushed her, causing her to fall; that Mrs. Curtsinger came out on top of her and Curtsinger came around the car and struck her, knocking her down; that he hit her four or five times with his fists, striking her in the eye and also in the chest, knocking her flat on her back; that she had her purse on her arm at the time and the gun was in the purse; that while she was lying on her back she pulled the gun and shot Curtsinger as he was learning over her; that after she had shot him they continued to scuffle, both the Curtsingers were trying to take her gun away from her but somehow she managed to keep them from doing it; that she fired four more shots in the air just to empty the gun; that they ended up fighting about 35 or 40 feet from the automobile where they started; that she then got up and went to her home and notified Frank Pickens, who lived next door, and asked him to call the sheriff; that she was bruised and skinned all over after the scuffle and was taken to the hospital. On cross-examination the defendant said that she did not see any gun at the time of the fatal encounter except the gun that she possessed; that she carried her gun with her when they started to leave her premises because she was afraid they would have trouble and she wanted the gun to protect herself.

Frank Pickens testified that he was the next door neighbor to the defendant; that on the night of the homicide one car drove into the defendant's home about 12:00 o'clock and another drove in later; that the flash of the headlights from the automobiles awakened him each time. About 3:00 o'clock Mrs. Garrett woke him up and said, "Get up, get up, I shot Curt, he forced me to do it."; and then asked him to call the sheriff, which he did. He testified that he was acquainted with the deceased and went to where he had fallen on the ground; that he would say the deceased weighed about 165 pounds and was about 5 feet 10½ or 11 inches tall; that he saw Mrs. Curtsinger and her dress and was dirty and her knees were scratched, and Mrs. Garrett's dress was split and it was dirty. He could see where they had been "wallering" on the ground; that he heard the woman, who they said was Mrs. Curtsinger, state that she didn't blame Frances Garrett for the shooting any more than she would Curt.

The first assignment of error is that the court erred in admitting incompetent, irrelevant, and immaterial testimony which was prejudicial to the defendant. This assignment of error is directed at the admission of testimony concerning the relationship which existed between the deceased and Mrs. Garrett. It is insisted that this evidence was inadmissible for the reason it placed the character of the defendant in issue when she had not offered evidence of her good character. When the county attorney was making his opening statement to the jury, he said in regard to the conversation had at the home of Mrs. Garrett that they, "were discussing the relationship of Frances Garrett with the deceased". Counsel for defendant objected to such statement and the court sustained the objection and admonished the jury not to consider that part of the county attorney's statement. When Mrs. Curtsinger was testifying concerning the conversation had at the home of Mrs. Garrett with the defendant, she testified that Mrs. Garrett asked the deceased if he had made up his mind what he was going to do and the deceased said, "Yes, I am going back to my wife and kids." This testimony was admitted without objection. She also

related that Mrs. Garrett said in the conversation, "You are not leaving. You better not leave."

The relationship which existed between the defendant and the deceased was the primary cause leading to the homicide. Under the theory of the state, the defendant shot the deceased because he informed her that he was breaking up his relationship with her and was going back to his wife and kids, and that she was shooting him rather than to give him up to his wife.

The statement of the sheriff concerning his conversation with the defendant was that the defendant said that Curtsinger had brought her home about midnight. Nearly all of the testimony concerning the relationship of the parties was admitted in evidence without objection and it had a logical connection with the homicide.

Although such proof might incidentally tend to reflect on the character of the defendant, it was admissible in evidence for the purpose of establishing the motive for the commission of the crime charged.

In the early case of Edmons v. State, 9 Okla. Cr. 603, 132 P. 923, this court stated:

"As a general rule, evidence as to the bad character of a defendant is not admissible unless he first offers evidence as to his good character; but this rule does not apply to cases in which character is an element of the offense upon trial."

In the instant case all the evidence of the relationship of Mrs. Garrett and the deceased was so entwined with the other evidence that it was impossible to separate it. Counsel for defendant recognized this fact, as he asked many questions himself along this line in an effort to establish that the deceased and his wife were in fact not living together at the time he was paying his attentions to the defendant.

Counsel for defendant in his second assignment of error alleges that the court did not adequately protect the rights of the defendant in the instructions which were given. Counsel does not point to any specific instruction which he says was improper. Neither did counsel request that any instruction be made more specific, nor did he offer any requested instructions.

We have examined the instructions which were given. They were full and complete. No exception was saved to the giving of any instruction. We find that they fully cover all of the issues which were presented. Four instructions were given defining the law pertaining to the right of self-defense. All four of these instructions were apparently taken from instructions which have been approved by the decisions of this court.

It is next contended that the court erred in sustaining the objection to competent and relevant evidence offered on behalf of the defendant. This assignment of error is directed at the refusal of the court to admit in evidence the penciled drawing prepared by the witness Camp. We have examined this exhibit, which is a penciled drawing purporting to show the road and location of other objects where the homicide occurred. Marked on the map are the distances from the car to the body, and it also shows the other intersecting roads in the immediate vicinity, and the distance the Curtsinger car was from the Honey Creek bridge.

The witness Camp stated that the drawing correctly represented the location of the various objects the night of the homicide. We can see no particular objection to the admission of this drawing in evidence. However there was no

issue as to the location of any of the objects shown in the drawing. We cannot see where its admission or rejection had any effect at all upon the trial. At the time the court sustained objection to the admission of the map in evidence he allowed the witness to use the map for the purpose of refreshing his memory in order to testify to the distance from the car to the body and for the purpose of refreshing his memory as to any other matters shown on the drawing.

The map was crudely drawn and the witness said that the measurements were not exact or drawn to scale but were made by stepping off the distances. We have adhered to the rule that photographs, drawings, and maps, may be introduced in evidence as an aid to the jury for the purpose of explaining the locations and positions of objects which are material to the inquiry, but that their admission in evidence rests largely in the discretion of the trial court, and, unless this discretion is abused, it will not be cause for reversal. Jackson v. State, 67 Okla. Cr. 422, 94 P. 2d 851. Under the record in this case there certainly was no abuse of discretion in regard to the ruling made by the court concerning this map.

In Wharton's Criminal Evidence, (11th Edition) Vol. 2, Sec. 772, the general rule pertaining to the admissibility of maps in evidence is stated as follows:

"A map, diagram or plat, if verified as a true and correct representation of the subject-matter about which testimony is offered or is to be offered, and if reasonably necessary and material, is admissible in evidence as a proper instrumentality to assist the court and jury in understanding the testimony and the case at hand. Courts would be deprived of a very great aid if they could not avail themselves of exhibits of this nature which, although ordinarily not evidence themselves, serve to illustrate and explain the testimony of witnesses. Such evidence, which is both documentary and demonstrative in nature, has generally been received to enable the jury the better to understand the oral testimony. The correctness of such exhibits is not presumed, but, in order that they may be used, the witness who prepared them must be called to prove their correctness from his own knowledge, and that they faithfully represent the thing to be illustrated. If the accuracy of the illustration is disputed, it is a question for the jury, turning upon the credibility of the witness. Where the exhibit does not purport to be exact, a map or rough sketch may be admissible, although not drawn to scale, or not correct in all particulars, if substantiated generally as to the subject-matter to which it relates by the testimony of the witness using the exhibit.

\* \* \*

"Such exhibits are generally used to illustrate the locus in quo of a crime, and their admission, not as testimony, but as illustrative of testimony, rests in the discretion of the trial court."

In State v. Simpson, 119 Wash. 653, 206 P. 561, which was a prosecution for robbery, it was held that it was not error to exclude the map of the scene of the robbery where it was neither material nor important.

Counsel for defendant in his brief makes the general statement that the evidence was insufficient to sustain the conviction for manslaughter. The summary of the evidence hereinabove related is a sufficient answer to this contention, for, if the evidence of the wife of the deceased is to be believed, the defendant was wholly unjustified in taking the life of Mr. Curtsinger.

It is also contended that the county attorney made prejudicial statements in his closing arguments to the jury. The record is silent as to this contention. If such prejudicial statements, as alleged in the brief of counsel for defendant, were made it was the duty of counsel to make a proper objection in order to

preserve the record for review on appeal. We cannot presume that the county attorney made the statements allegedly made by him, and in the absence of a record showing the statements that were made, and that they were properly objected to, this assignment cannot be considered.

We have given this case careful consideration. On the whole it was fairly tried. Even under the testimony of the defendant there was slight justification for taking the life of the deceased. The jury seems to have taken into consideration all of the factors which were favorable to the defendant as they assessed only the minimum punishment for manslaughter in the first degree.

The judgment and sentence of the district court of Murray county is affirmed.

BRETT, P. J., and POWELL, J., concur.