## LOGAN v. STATE.

No. A-11559. Jan. 9, 1952.

(239 P. 2d 1044.)

Wendell G. Stockton, Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., for defendant in error.

JONES, J.   The defendant, Dan Deo Logan, was charged by an information filed in the district court of Oklahoma county with the crime of burglary in the first degree; was tried; convicted; and pursuant to the verdict of the jury was sentenced to serve seven years in the State Penitentiary; and has appealed.

The following propositions are presented in the brief of defendant: (1) The evidence was insufficient to sustain the conviction.   (2) The court erred in admitting testimony of other offenses. (3) The court erred in admitting testimony by the officers as to arrests and charges which had previously been made against defendant. (4) The punishment was excessive.

The information charged the defendant with breaking and entering in the night time a certain one-story frame house located at 1601 Southwest 31st street in Oklahoma City, in which house Mrs. Pauline Gates was then and there sleeping at the time of the entry by the defendant, with the intent on the part of the defendant to commit a felony therein.

The proof showed that on the night in question about 9:30 p. m. Mrs. Gates had laid down on the divan in the living room of the house in question.   She was awakened by hearing some one step up on the porch.   The defendant then opened the door and entered the house and as he did so he turned off the light in the living room and turned on the porch light.   Mrs. Gates testified:

"A. I asked him what he was doing, or what he wanted, I don't remember just what I said, only that I wanted to know what he was doing in my home. He was muttering something that I could not understand.   It wasn't distinct. He took a step or two toward me and at the moment Mrs. Bowling, across the street, called to me and said: 'Pauline, are you in trouble?', and I said: 'Yes'. At the same moment I was mad, and I told him to get out of there and Mrs. Bowling called and said: 'Do you want me to call the police?', and I said: 'Yes, call the police and call my husband, he is right down at the house.'   So, then, he turned and went on down the hill, on 31st street, toward Brock Park."

Two days later Mrs. Gates picked the defendant from a group of four men at a show up in the police headquarters and identified him as the man who had entered the house on the night in question.

Mrs. Dorothy Bowling testified that she lived just across the street south from Mrs. Gates; that about 9:30 p. m. on June 26, 1950, she observed a man

looking in the windows at Mrs. Gates' home, and then saw him standing just off the porch looking in the door. He had a package in his hand which he set down under the south window. The man she saw fitted the general description of the defendant. She saw the man walk up on the porch, reach inside the house and switch off the light in the living room, and switch on the porch light. He then entered the house. She then next observed the man backing out of the house and Mrs. Gates facing him, and Mrs. Gates hollered to her to call the police. The man on the porch grabbed his package and ran down the street, and the witness called the police. The police officers came in a few minutes and she gave them a description of the man.

V. E. Moncrief and Jack Skaggs were two police officers who had been called to the 1600 block on Southwest 34th street to investigate some prowling which had been reported. They were sitting under a large tree with their lights out when they noticed two men running north on 34th street pursuing another man. They then started in pursuit and caught up with the defendant as he ducked between two houses in the middle of the block. The policemen jumped out of their automobile. One of them went around one side of the house, and the other the other side, and they found him lying down in the garden back of the house. The front of his trousers was unzipped. The defendant did not appear to be intoxicated, but he had the smell of alcoholic liquor on the breath. He was running very fast before he was caught.

Hilton Geer testified that he talked to the defendant at the. Oklahoma City police station the day after his arrest, in which defendant stated that he remembered being in the house at 1601 Southwest 31st street and being chased away from the house; that he had been drinking and when he was drinking he had an urge to be with women.

The defendant testified that he was not regularly employed but that he had been performing some labor for Jack Reece, cleaning windows, and that for about thirty days prior to the time of his arrest he had been staying at the home of his sister, which was just one block from the house which it is alleged he entered on the night of June 26th. He testified that after getting off work between 4:00 and 5:00 o'clock he commenced drinking beer and later bought a pint of whiskey, which he drank; that he started home with a bag of clothing and some beer in a sack; that he did not remember entering the house of Mrs. Gates at 1601 Southwest 31st street, and if he did so it was by mistake on account of his intoxication and because he thought it was his sister's house; that both houses sit on the corner only one block apart. On cross-examination the defendant denied entering the homes of Mrs. Dennis W. Grady, Mrs. Edna Andrews and Mrs. J. R. Middleton at about the same time on the evening in question as the Gates' house was allegedly entered, which homes were in the immediate vicinity of the Gates' home.

The sister of defendant testified that she lived at 1644 Southwest 34th street, which is one block from the Gates' house; that the defendant had been residing at her home for about a month prior to the time he was arrested; that the defendant does common ordinary construction labor. On cross-examination she stated her house was a small house consisting of three rooms and a bath and sits at the back of the lot. There is no sidewalk leading up to the house. It has only a small porch on the front.

In rebuttal Mrs. J. R. Middleton testified that she resided at 2104 Southwest 35th street in Oklahoma City; that about 10:15 p. m. she and her two small children were at home and she noticed a man dart back from the front door; that she was scared and picked up the Bible and threw it and said, "Get out of

here", and the man didn't move; that she walked to the front door and laid her head against the screen and saw the man standing there; that she said, "What do you want?", and he said, "How about a little fun", and the witness said, "You had better get from here", and the man said something else about fun and the witness said, "I am going to call the law"; that she started to the telephone and the man ran; that the man that she saw was the defendant. On cross-examination she testified that the man didn't act right and she thought he was under the influence of dope.

Mrs. D. W. Grady testified that on June 26, 1950, she lived at 1624 South-west 35th street in Oklahoma City; that around 10 o'clock she was sitting in the living room reading; that her attention was attracted to a man standing at the screen door looking in at her, which man was the defendant. Her husband was sleeping in the other room; that she jumped up and took about two steps toward the bedroom door and opened the door; that the defendant jumped off of the front porch and ran to the bedroom window; that she said, "What do you want?", and the defendant said, "Pull up your dress, please pull up your dress"; that she started shaking her husband, and when he arose up in the bed the man at the window started running down the driveway. They called the police and reported the occurrence.

Mrs. Doyle Andrews testified that she lived at 1620 Southwest 34th street on June 26, 1950; that she had been sitting outside of her house about 10:00 p. m. and got up to go into the house, and saw a man standing at the west side of her house; that she ran into the house and dialed her neighbor across the street, whose name was Roy Thomas; that she got a good look at the man and saw him again about an hour later that night. When she saw him coming from another house she informed Mr. Thomas and her son, who had come in for the night by that time, that the man she saw running down the street was the man that she had seen peeking around her house, and they started chasing him.

Roy Thomas testified that he lived across the street from Mrs. Andrews; that Mrs. Andrews called him about 10:00 p. m. and notified him what had occurred at her house, and he in turn had called the police; that later the police came out to the Andrews' place and while they were there they received a report over the car radio that a man was prowling at 1624 Southwst 35th street; that about that time Mrs. Andrews saw a man passing under a street light and stated, "There's the man", and the witness and Mrs. Andrews' son started chasing him; that they passed the police scout car and the policemen took after the man and caught him. The man was the defendant.

The statute pertaining to burglary in the first degree provides:

"Every person who breaks into and enters in the night time the dwelling house of another, in which there is at the time some human being, with intent to commit some crime therein, either:

"1. By forcibly bursting or breaking the wall, or an outer door, window, or shutter of a window of such house or the lock or bolts of such door, or the fastening of such window or shutter; or,

"2. By breaking in any other manner, being armed with a dangerous weapon or being assisted or aided by one or more confederates then actually present; or

"3. By unlocking an outer door by means of false keys or by picking the lock thereof, or by lifting a latch or opening a window, is guilty of burglary in the first degree." 21 O. S. 1951 § 1431.

Counsel for the defendant concede that all the elements of burglary in the first degree were proven by the state, except they deny that it was shown

there was any intent to commit a crime in the house in which Mrs. Gates was residing. Of course, unless there was an intent to commit a crime in the dwelling house, no burglary was committed even though there was an unlawful breaking and entering. The defense interposed by defendant, that he had wandered into the wrong house under mistaken belief that it belonged to his sister, was so flimsy that it could not be sustained. The sister of defendant lived in a very small square frame house which sat well back from the street. No sidewalk led up to the house. The house of Mrs. Gates was a much larger house with sidewalk leading up to the front porch, and the living and dining room extending clear across the front of the house. There were two large windows in the living room on the south through which a person could plainly see the interior of the house. The neighbor, Mrs. Bowling, saw the defendant peeking through the windows, lay down a package he was carrying and then walk up to the front door. He would not have laid down his package if he was going into the house which he thought was the home where he was living with his sister. The evidence of the three neighbor women shows that the defendant at about the same time was prowling around other houses in the neighborhood, molesting women. His statements to them in which he said, "How about a little fun?", and to another, "Pull up your dress", indicate that his purpose in entering the home was probably to satisfy his sexual lust rather than an intent to steal or commit any other crime therein.

Of course, if the defendant had only the intent of attempting to persuade Mrs. Gates to have sexual intercourse with him it would only constitute simple assault and not a felony. If she had acceded to his persuasion and committed the sexual act it would have constituted rape, but since she was a married woman it would constitute the felony of adultery.

The defendant had no lawful purpose in entering the house. The state introduced sufficient evidence to require the case to be submitted to the jury for their determination of the intent with which the house was entered. The defendant might not have intended to commit the crime of rape because this signifies a forcible ravishing where the female is above the age of 18, as were all of the females who testified in this case, because in each instance where the female balked and threatened the defendant, after he had made his advances, he turned and fled.

In determining whether the crime of burglary has been committed the jury is governed by the intent of the individual at the time the entry was made. The accused could have had the intent of raping, or committing adultery, at the time the entry was made, but changed his mind when he was confronted by a very determined and outraged woman.

It is the general rule that when a defendant is put on trial for some offense, he is to be convicted, if at all, by evidence which shows that he is guilty of that offense alone, and evidence of other offenses, though of the same nature, is not admissible for the purpose of showing the accused is guilty of the particular offense charged against him. Killough v. State, 94 Okla. Cr. 131, 231 P. 2d 381; Warren v. State, 93 Okla. Cr. 166, 226 P. 2d 320; Combs v. State, 94 Okla. Cr. 206, 233 P. 2d 314. However, as an exception to the general rule, evidence of other offenses recently committed by the accused similar to the offense charged is admissible when such evidence shows the guilty knowledge or intent in the commission of the offense charged against him. Bunn v. State, 85 Okla. Cr. 14, 184 P. 2d 621.

Trial courts should examine with care evidence offered to show other offenses committed by the accused. It is not sufficient that a person has com-

mitted similar crimes. That alone does not justify the admission of evidence of other offenses if they are independent of each other. Bunn v. State, supra. But where the trial court can clearly see a visible connection between the alleged other offenses to the one charged, the evidence of such other offenses may properly be admitted. Combs v. State, supra.

In this particular case the sole question placed in issue by the defendant was the intent with which the house was entered. The four particular places visited by the defendant, as shown by the evidence, were all within a radius of one block of each other and the prowling was done within a few minutes, and might be considered as an almost continuous transaction.

Every case must be examined in the light of the particular facts shown by the record in that case. We think the evidence of the prowling around the other homes was in such immediate connection with the crime alleged that it was brought within the exception to the rule that evidence of other alleged offenses may be introduced for the purpose of showing the guilty knowledge or intent of the accused. These acts of defendant were introduced in rebuttal after defendant had interposed his defense and they were properly admitted under the circumstances.

The third assignment of error, pertaining to the testimony of a police officer as to arrests and charges made against the defendant, is directed at the testimony of Officer Hilton Geer.

This officer was called as a witness by the state to testify concerning a conversation had with the defendant in connection with his entry into the Gates' house, which conversation allegedly occurred the day after his arrest. After the officer had testified that defendant admitted being chased away from the house at 1601 Southwest 31st street, which was the Gates' house, he was subjected to a cross-examination by the attorney for the defendant. A part of this cross-examination is as follows:

"Q. Do you have in your department over there, any record of convictions against this man, of disorderly conduct, or interfering or otherwise molesting a woman? A. He's been picked up several times. Q. Do you have any record of convictions? A. In police court is all. Q. Do you have a record of conviction in Police Court? A. Yes, sir. Q. Do you have that with you, Mr. Geer? A. No, sir; Mr. Holbird has it there. Q. You are positive about that? A. Mr. Mullenix has handled him several times. Q. I am just asking you what you know, Mr. Geer? A. I don't know only from records on the previous deals. Q. Do you have a record, Mr. Geer, that you would like to enlighten this jury on. A. I didn't mention his past record. You brought up his past record. Q. I am asking you, point blank, Mr. Geer, if there is any record in the Police Court, State, or otherwise, of this man molesting a woman? A. No. Redirect Examination By Mr. Holbird: Q. I will ask you to refresh your memory, and answer the last question again? A. He has been charged with disorderly conduct before. Q. Where? A. Oklahoma City Police Department. Mr. Stockton: We move to strike that as incompetent, irrelevant and immaterial. The Court: Yes; to be charged is not sufficient. Objection is sustained. Exception allowed. Mr. Holbird: Exception. Q. In connection, now, with the question as to whether or not he had been charged with * * * * Mr. Stockton: If the Court please, no such question was asked. I asked him if he had been convicted of any crime in the State or the City Courts of molesting woman. I ask that the jury be admonished to disregard this. The Court: The jury is admonished that the fact that a man is charged is no evidence. He's got to be convicted. Q. No further questions."

It is established law that the character or reputation of the defendant may not be attacked by the state unless it is first placed in issue by the defendant

offering evidence of his good character. Garrett v. State, 95 Okla. Cr. 44, 239 P. 2d 439.

Also, for the purpose of affecting the credibility of a witness he may be asked whether he has been convicted of a crime but he may not be interrogated about arrests or charges where there is no conviction. Potter v. State, 91 Okla. Cr. 186, 217 P. 2d 844.

The issue about which complaint is now made was injected into the case by counsel for the defendant. It is true that in the first question, above set forth, he asked the witness, "Do you have any record of convictions against this man of disorderly conduct, or interfering, or otherwise molesting a woman?". But then he further asked this question, "I am asking you, point blank, Mr. Geer, if there is any record in the Police Court, State, or otherwise, of this man molesting a woman?" The second question was not limited to convictions sustained by the accused, but was a question as to whether or not there was a record of him molesting a woman. Under such a question the police officer would have a right to testify concerning the record of complaints made in the police department of the accused molesting a woman. The county attorney attempted to bring out this record after counsel for defendant had inquired about it, but the Judge sustained the objection by counsel to such question and admonished the jury to disregard tetstimony as to alleged charges. Although the police officer seemed a witness who was eager to make disparaging remarks about the accused, we feel that the alleged error, about which complaint was made, was invited by the questions asked by counsel. Counsel may not through their questioning invite error and then later complain of such evidence.

There is merit to the contention that under the facts in this case the punishment assessed was apparently excessive. However, it was the minimum sentence fixed by the law for burglary in the first degree, and there is no less sentence to which this court might modify the sentence which was imposed for the crime charged. The convicted person's only recourse under such circumstances is through the exercise of clemency by the Governor.

The judgment and sentence is affirmed.

BRETT, P. J., concurs.