Danny Lee GRIZZLE, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–76–1.

Court of Criminal Appeals of Oklahoma.

Jan. 24, 1977.

Bulla, Horning, Johnson & Glasgow, Oklahoma City, for appellant.

Larry Derryberry, Atty. Gen., Robert L. McDonald, Asst. Atty. Gen., Annis Kernan, Legal Intern, for appellee.

## OPINION

BUSSEY, Judge.

Appellant, Danny Lee Grizzle, hereinafter referred to as defendant, was charged, tried and convicted in the District Court, Oklahoma County, Case No. CRF–73–2426, for the offense of Murder in the Second Degree. From a judgment and sen-

tence of ten (10) years to life imprisonment in the State Penitentiary, defendant perfects this timely appeal.

The first witness was Carolyn Haas, whose previously recorded testimony was introduced over defendant's objection. The testimony divulged that on August 29, 1973, she resided in apartment no. 65 of the Sandpiper South Apartments in Oklahoma City. At 7:00 p. m. on that day there were present at her apartment the defendant, Ronald Murray and Patrick O'Connor. These three men left about 8:00 p. m., but only the defendant and Murray returned at 10:00 p. m. The party, then consisting of the witness, defendant, Murray and others, then went to Glenn's Steak House and the defendant paid the tab with a $50.00 bill. Haas related that on August 30, 1973, when police officers came to her apartment, she was directed, by the defendant, to hide a number of bullets. She subsequently turned this .38 caliber ammunition over to the police. Further, Haas identified State's Exhibit No. 2, as bullets similar to those she had hidden and identified State's Exhibit No. 1 as a gun similar to the one she had seen stuck in the defendant's pants on the evening of August 29, 1973.

Roberta Tanksley's recorded testimony, also introduced over the objections of the defense, was substantially similar to that of Carolyn Haas. In addition, the witness saw a handgun, which she identified as being similar to State's Exhibit No. 1, on top of the refrigerator in apartment no. 65, on August 30, 1973. When the police arrived, Tanksley hid the weapon, at the defendant's directions, in the bedroom dresser. She later turned this .38 caliber revolver over to the police.

The State next called Ronald Murray, who exercised his privilege against self-incrimination as to the events of August 29, 1973. Murray did recount that he signed a written statement, identified as State's Exhibit No. 8, on August 30, 1973, before Detective Bill Hooten. The statement related that the defendant had done the actual shooting of O'Connor. Murray also identified State's Exhibit No. 11, as a writing he had witnessed the defendant sign while in the Oklahoma State Penitentiary. The statement was signed before Murray and a Notary Public, and related that Murray was not responsible for O'Connor's death. Murray testified that the defendant gave this statement in order to help Murray. The writing was mailed to the Oklahoma Court of Criminal Appeals, and was not altered in any way that the witness could identify. At this time court was adjourned for the night.

The next day, Detective Adam Knight testified that on August 30, 1973, pursuant to a search warrant, he entered apartment no. 65 of the Sandpiper South Apartments and recovered a .38 caliber Colt revolver from a bedroom dresser. He identified State's Exhibit No. 1 as this weapon, and State's Exhibit No. 2 as the bullets he recovered from the same apartment. Subsequent to this search, Knight arrested Murray outside apartment no. 65 and discovered five rounds of .38 caliber ammunition on his person. Murray told Knight that he could not remember the events of August 29th, as he had passed out drunk in the backseat of O'Connor's car.

Murray was then recalled for cross-examination, and admitted that State's Exhibit No. 1 was his gun, which he was to have sold to the defendant. The sale never occurred. Murray reiterated his statement of O'Connor's death as set out in State's Exhibit No. 8. This change in position, regarding Murray's right against self-incrimination, was the result of a promise by the District Attorney to protect Murray from threats he had received on his life if he (Murray) testified against the defendant. Murray then related that under defendant's directions O'Connor drove to a secluded country road and that the three men exited the car. The defendant ordered O'Connor, at gunpoint, to empty his pockets so as to discover if O'Connor was a "narc." No identification was found, the wallet was thrown on the hood of the car, and the defendant coerced O'Connor to walk down a ravine. Murray could not see the two men, but did hear two shots. Immediately there-

after, the defendant came running back to the car, ordered Murray to grab the wallet and the $200.00 that was in it, and the two men drove off. The car was wiped clean of fingerprints and abandoned. O'Connor's wallet and key chain were discarded the following day. Moreover, Murray denied leaving defendant at his mother-in-law's house and then killing O'Connor himself. He also said he had not written State's Exhibit No. 11 himself, and that the fingerprints thereon were not his own.

Officer Robert Thompson's testimony disclosed that at 3:00 p. m. on October 30, 1973, he discovered the body of Patrick O'Connor in the vicinity of Choctaw Road on Southeast 44th Street. Thompson affirmed that State's Exhibits Nos. 3, 4 and 5, correctly depicted the scene, and the position of the body. On October 31, 1973, Thompson took down State's Exhibit No. 1, a written statement signed by the defendant, which held Murray responsible for O'Connor's death. Thompson then booked the defendant on charges of First Degree Murder.

The testimony of Irvin Box asserted that on August 31, 1973, he was an Assistant District Attorney, assigned as legal advisor to the Oklahoma City Police Department. On that date he interviewed the defendant and Murray simultaneously, and advised them of their constitutional rights. Box told the men he had their prior statements, State's Exhibits Nos. 7 and 8, before him, and that the statements were inconsistent only as to who actually did the killing. Box accused the defendant of lying, after which defendant developed "nervous mannerisms," and then stated, "all right, I shot him, but I was ribbed into it." The defendant went on to say that he and Murray had previously discussed robbing O'Connor, but that Murray insisted that it would be necessary to "blow him away." The defendant set forth the events of the 29th, including the robbery and killing of O'Connor. When Box then took steps to record the statements, the defendant said that he wanted to consult with an attorney. The interview immediately ceased and the defendant was

provided with the telephone book and telephone.

Dr. Fred Jordan explained that he had performed the autopsy of Patrick O'Connor, whose death was caused by a gunshot wound to the head. Jordan identified State's Exhibit No. 6 as the bullet fragments he removed from O'Connor's brain.

Lastly, Officer Harold Neal testified that on August 31, 1973, under the directions of Murray, he discovered O'Connor's wallet under a bridge on South Meridian. He identified State's Exhibit No. 9 as that wallet, and identified State's Exhibit No. 10 as a photo correctly depicting the scene where the wallet was found. A search for O'Connor's keys proved fruitless.

At this point the State rested and defendant's Demurrer to the evidence was overruled.

The defendant's initial witness was Barbara Grizzle, the wife of the defendant. She narrated that a few days before O'Connor's death she had quarreled with the defendant and did not know where he was thereafter. The witness said that after previous fights the defendant had often gone to his mother-in-law's house, in an effort to find her (the witness).

Debby Palmer, defendant's niece, recounted that on August 29, 1973, she went with Barbara Grizzle to the Sandpiper South Apartments in an attempt to locate the defendant. They did not find the defendant, but did leave a note on the door of apartment no. 65.

The defendant's first and second assignments of error allege a violation of defendant's right to confront his accusers, by the admission into evidence of the prior recorded testimonies of Carolyn Haas and Roberta Tanksley. Said testimonies were given at the defendant's first trial of this cause. The defendant contends that the State failed to establish the unavailability of the witnesses for this trial, and there was an absence of adequate confrontation of these witnesses. As to the unavailability of these parties, we have long recognized that the State shoulders the burden of proving,

by a good faith effort, that said witnesses were truly unavailable. *Barber v. Page,* 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968); *In re Bishop,* Okl.Cr., 443 P.2d 768 (1968). Whether the State can maintain this burden is necessarily a question of proof. The glaring examples at either end of the spectrum are of little aid when the question enters into the hazy middle ground of "good faith effort." We examine the present controversy within this context and find that it rises above the fog of constitutional violation. While the State's research did not touch all possible avenues, it was not a last minute, mad-dash effort. The deputy checked the addresses on the subpoenaes, talked to the apartment manager on two occasions, and inquired at three different apartment complexes. He returned to the Sandpiper South Apartments on three different occasions, and talked to the neighbors, all to no avail. The deputy found no listings with the water department or O.G. & E., and the telephone numbers he had were disconnected. This investigation was initiated eleven days before trial and totaled seven hours over a three-day span. The special prosecutor also attempted to contact the witnesses by telephone, and through the Sandpiper Apartments. This research does not reach the pinnacle of investigatory inquiry, yet it is sufficient to sustain the State's good faith effort.

█ In the alternative, the defendant asserts that even if the witnesses are found to be actually unavailable, the prior cross-examination was inadequate. We would first accentuate that these testimonies were recorded at a full-fledged trial and not a preliminary hearing or a limited evidentiary hearing. Upon review of the prior trial transcript, we find that the defendant was afforded competent counsel, who was not restricted in his cross-examination of Haas or Tanksley. In light of these findings, we cannot agree with the defendant's claims of inadequate confrontation. See, *Smith v. State,* Okl.Cr., 546 P.2d 267 (1976) and *Pittman v. State,* Okl.Cr., 272 P.2d 458 (1954).

█ In his third and fourth assignments of error, defendant alleges that the trial court erroneously denied him a preliminary examination on the amended information. While Oklahoma has long protected the defendant's interests in having a preliminary examination, it is also recognized that limitations exist as to supplying such examination. Pleading on the merits, prior to a Motion to Quash, has been construed as a waiver of the preliminary examination. *Ervin v. State,* Okl.Cr., 368 P.2d 256 (1962). Additionally, it has been held that an amended information does not require a new preliminary examination if it does not substantially alter the charge, *Raybourn v. State,* Okl.Cr., 339 P.2d 539 (1959), or necessitate the introduction of new issues, *Sherfield v. State,* 96 Okl.Cr. 223, 252 P.2d 165 (1952). In this case, amending an information which charged First Degree Murder to one charging Second Degree Murder was not such an alteration as to demand a new preliminary examination. The basic thrust of the two charges is identical, to-wit: the premeditated killing of a human being by the defendant. Nor are new issues interjected. In fact, the amended information deletes issues present in the original, as the State need no longer prove the commission of the armed robbery. In instances such as this, the defendant is not entitled to a preliminary examination. *Cody v. State,* Okl. Cr., 376 P.2d 625 (1962) and *Sherfield v. State,* supra.

█ As his fifth assignment of error, the defendant contends that rulings by the trial court in the examination of a juror denied him a fair and impartial jury. Specifically, the defendant points out that the juror in question had followed the development of this case in detail, that her children knew the victim's family, and the juror attended the funeral of the victim. The defendant's challenge of this juror for cause was overruled. Whether or not a juror is able to serve in an objective, unbiased manner, as the law demands, is necessarily an inquiry within the discretion of the trial court. *Murphy v. State,* 72 Okl.Cr. 1, 112 P.2d 438 (1941). Only where an abuse of this discretion is evident will the trial

court's rulings be disturbed. *Greathouse v. State,* Okl.Cr., 503 P.2d 239 (1972). There was no such abuse here. Although the juror was clearly attuned to the pretrial publicity in proceedings, she repeatedly stated that she could maintain an unbiased position and the trial court accepted these statements as true. We will not reverse these findings.

■ The defendant also alleges that his examination of this juror was restricted. In rejecting this contention we only reiterate that the character and scope of juror examination rests upon a continuum of facts and circumstances surrounding each juror and at which point the inquiry must cease is a question within the trial court's discretion. *Akins v. State,* Okl.Cr., 502 P.2d 1274 (1972) and *Jones v. State,* 20 Okl.Cr. 154, 201 P. 664 (1921).

■ The defendant additionally claims he was entitled to nine peremptory challenges. As 22 O.S.Supp.1975, § 655 relates, the defendant was not so entitled as he was not on trial for a capital offense.

■ The defendant's sixth assignment of error is that the admission into evidence of State's Exhibit No. 5, denied the defendant a fair trial. The exhibit the defendant challenges is a frontal photo of the victim, taken at the scene, before the body had been moved. The defendant claims this photograph lacks sufficient probative value to outweigh its prejudicial qualities. First, it must be noted that the admissibility of photographic evidence is a matter within judicial discretion and is only reversible error if an abuse of such discretion is shown. *Garrett v. State,* 95 Okl.Cr. 44, 239 P.2d 439 (1951). Second, we find that the photograph tended to corroborate the State's testimony as to the nature of the wounds inflicted, and lapse of time since death. The photograph was not so gruesome or prejudicial as to outweigh its probative value, therefore we reject this assignment of error.

■ It is the defendant's seventh assignment of error that the introduction of State's Exhibit No. 1 denied him a fair trial.

The defendant asserts that the .38 caliber weapon was not sufficiently connected to him, or the death of O'Connor, to warrant its introduction. A review of the evidence forces us to discard the .defendant's argument. The handgun was identified as being similar to the gun seen on the defendant's person on the day of O'Connor's death. It was also identified as the gun which the defendant directed Roberta Tanksley to hide on August 30, 1973, when the police arrived at apartment no. 65. This pistol and some .38 caliber ammunition were later turned over to the police. Murray testified that the defendant had planned to buy the pistol from him, had not paid for it, but was in possession of the gun. Additionally, Murray stated that the defendant pulled a gun on O'Connor on August 29, 1973, before marching O'Connor into the woods. We have long held that if sufficient evidence exists from which a reasonable inference can be drawn that the instrument sought to be introduced was used by the defendant to commit the crime, then it shall be admissible. *Pickens v. State,* Okl.Cr., 450 P.2d 837 (1969) and *Spence v. State,* Okl.Cr., 353 P.2d 1114 (1960). The evidence clearly meets this standard.

■ As his eighth assignment of error the defendant alleges that the trial court erred in not giving the defendant's requested instructions regarding accessory after the fact. We are of the opinion that *Wilson v. State,* Okl.Cr., 552 P.2d 1404 (1976) is dispositive of this issue, wherein it is stated that accessory after the fact is not a lesser and included offense of the principal crime, and it was error when the trial court gave the requested instruction thereon. We, accordingly, find this assignment of error to be wholly without merit.

■ The defendant's ninth assignment of error is that the evidence regarding the armed robbery of O'Connor was erroneously admitted. The defendant does not deny that the evidence of other crimes is admissible under one of the well-recognized exceptions, rather, he asserts that the introduction of the robbery, in this case, changes

the trial to one of First Degree Murder. We certainly agree that armed robbery is an aggravating circumstance of our Murder One Statute; however, we disagree that it is therefore excluded from introduction in a Murder Two trial if it fits within an exception to the rule prohibiting the evidence of other crimes. The evidence elicited that the defendant and Murray had previously discussed robbing O'Connor and concluded that it will be necessary to "blow him away." It was also disclosed that the defendant feared O'Connor was a narcotic agent. When evidence of a separate crime tends to establish intent, motive, or absence of accident or mistake, relative to the crime charged, it is admissible. *Brown v. State,* Okl.Cr., 487 P.2d 963 (1971) and *Brannin v. State,* Okl.Cr., 375 P.2d 276 (1962). As the evidence fits within these exceptions, we must reject the defendant's contentions.

█ The defendant's eleventh assignment of error concerns the introduction of State's Exhibit No. 11, which the defendant alleges was inadmissible. Such exhibit is a written statement by the defendant, while in prison, which purports to relieve Murray of any blame for O'Connor's death. First, the defendant proclaims that the State failed to establish the authenticity and trustworthiness of this written instrument. With this we disagree. The statement was signed by the defendant and his fingerprints were present thereon. Additionally, the statement was notarized. The testimony of Murray, who was subject to cross-examination on the subject, displayed the circumstances surrounding the taking of this writing. None of this evidence was controverted, nor did Murray admit to any falsification of the record. Admission of this evidence was well within the acceptable limitations. See, 32 C.J.S. Evidence § 625, page 791.

█ Second, the defendant argues that he was not given a Miranda warning by the attorneys or officials present when Exhibit No. 11 was executed. The defendant misconstrues the requirements of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The thrust of the Miranda warnings go not to voluntary statements, but those statements which result from interrogations and compulsion by authorities. *Gibson v. State,* Okl.Cr., 476 P.2d 362 (1971). Voluntary statements by a defendant, whether in custody or not, should not be discarded as inadmissible evidence. *Miranda,* supra; *Fields v. State,* Okl.Cr., 284 P.2d 442 (1955). Here the uncontroverted testimony set forth that the statement was made voluntarily by the defendant in an effort to aid Murray. As no showing of coercion or solicitation by public officials, in any degree, was offered, we reject the defendant's argument.

█ Third, the defendant states that the writing included evidence of other crimes and was, therefore, erroneously admitted. Having decided above that this voluntary statement by the defendant was properly admitted, this final thrust of defendant is effectively blunted by our holdings that once a statement is admissible, it is wholly and entirely admissible, whether or not it subsequently proves to be favorable or unfavorable. *Taylor v. State,* 95 Okl.Cr. 98, 240 P.2d 803 (1952).

█ The defendant's twelfth assignment of error conglomerates a number of comments by the special prosecutor which purportedly prejudiced the defendant and inflamed the passions of the jury. We have reviewed said comments in their entirety and find defendant's assertion to be without merit. We have repeatedly held that the right of argument contemplates liberal freedom of speech, and only when argument by the prosecutor is grossly improper and unwarranted on some point which may have affected defendant's rights, can reversal be based on improper argument. See *Klineokole v. State,* Okl.Cr., 456 P.2d 623 (1969) and *Harvell v. State,* Okl.Cr., 395 P.2d 331 (1964).

█ In his final assignment of error, defendant asserts that an accumulation of the foregoing assignments of error, when taken as a whole, denied the defendant procedural due process. The defendant also raises, for the first time, the question of the

existence or non-existence of an arraignment. The record does not display whether the defendant was ever given an arraignment on the amended information, the defendant denying such and the State submitting affidavits as to when it did occur. Under the facts of this case we deem it unnecessary to consider whether an arraignment actually took place. The well-known purpose of an arraignment is to notify the defendant of the charges against him and to allow the defendant to enter a plea. In the present case the defendant was represented by competent counsel, made motions to set bail and quash the information, participated in the voir dire, proceeded to trial, cross-examined the State's witnesses, demurred to the evidence, introduced evidence in his own defense, and heard the court instruct the jury that the defendant had pled not guilty. Under such circumstances, we feel it is immaterial that the record shows no formal arraignment. *Hast v. Territory,* 5 Okl.Cr. 162, 114 P. 261 (1911).

▬ As to the accumulation of errors and their prejudicial effect on the defendant, we find this position untenable. Only numerous irregularities which, together, deny the defendant a fair trial, will require reversal. *Lovell v. State,* Okl.Cr., 455 P.2d 735 (1969). As the above discussions have shown, such a list of irregularities did not occur and the defendant was not denied a fair trial.

For the above and foregoing reasons, the judgment and sentence appealed from is, accordingly, *AFFIRMED.*

BRETT, P. J., and BLISS, J., concur.