Thomas Scott KAPOCSI, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–82–9.

Court of Criminal Appeals of Oklahoma.

Aug. 25, 1983.

Rehearing Denied Sept. 19, 1983.

**1158**

Thomas E. Salisbury, Sands Springs, for appellant.

Michael C. Turpen, Atty. Gen., William H. Luker, Asst. Atty. Gen., State of Okl., Oklahoma City, for appellee.

## OPINION

BUSSEY, Presiding Judge:

In the early morning hours of June 17, 1980, the woman with whom the appellant, Thomas Scott Kapocsi, had been living left him to reconcile matters with her husband. Upon discovery of the woman's absence, the appellant embarked upon a search for her. Having failed to find her, the appellant returned to his apartment. He managed to contact the woman at her work by telephone, and was informed that she was leaving him. Subsequently, the woman's husband, the victim in this case, appeared at the appellant's apartment to retrieve some of the woman's belongings. After an exchange of words and threats, the appellant shot the victim in the chest at close range with a 30.06 caliber rifle. The victim stumbled out of the appellant's apartment into the hall where he died of the gunshot wound.

The appellant immediately telephoned the Sand Springs Police Department and reported the shooting. Upon the arrival of the police, the appellant was taken outside his apartment, given a *Miranda* warning, questioned briefly and returned to the apartment to demonstrate where he and the victim were positioned when the shooting occurred. At approximately 9:30 a.m., the appellant was escorted to the Sand Springs Police Department. He requested to make a telephone call at approximately 3:00 p.m., but was informed he could not do so until he had talked to a detective.

The appellant was interrogated by detectives at approximately 4:45 p.m. At that time, he initialed and signed a written waiver of rights; and gave the detectives a written account of how the shooting oc-

curred. The appellant was then interrogated, and sent back to his cell to "think." As he was being locked in the cell, the appellant indicated that he wanted to make a second statement. He was again given a *Miranda* warning. He made an oral statement, which was tape recorded; and then made a second handwritten statement, based on the oral statement.

The appellant was allowed to talk to his mother at 8:00 p.m. He was arraigned at 1:00 p.m. on June 19.

### I.

The appellant's first assignment of error is divided into three subparts in which he asserts: A) his right to counsel was violated during the interrogations which produced his statements; B) the statements were involuntary and coerced; and C) the taped statement was improperly admitted at trial

because it contained references to a polygraph examination; and further, that the prosecutor improperly questioned a witness concerning the polygraph test.

### A.

■ The appellant alleges that as he was being read his rights prior to interrogation, he made a statement which amounted to an "equivocal request" for an attorney.[1] He cites several federal cases in which defendants who made similar statements were held to have been deprived of their right to counsel when interrogation continued.[2] We note, however, that upon cross-examination of the appellant on this matter during that hearing, the appellant stated that his remark "I'm thinking I will need a lawyer" was not a request for the detectives to secure him an attorney at that point.[3] This

---

1. The following is exerpted from the transcript of a special hearing held on May 12, 1982.

    Q. (Mr. Salisbury) Scott, you've been talking about they read each right to you individually and you initialled it; is that the numbered portion at the bottom you are speaking about?
    A. (Appellant) Yes, sir, it is.
    Q. After you initialled all these lines, what happened next?
    A. Detective Taylor read—started reading this waiver part of it.
    Q. Okay, would you read that portion out loud to me now?
    A. I read the statement of my rights shown before: I understand what my rights are; I am willing to answer questions, make a statement; I do not want a lawyer. I understand and know what I'm doing; no promises or threats have been made to me, no pressure of any kind has been used against me.
    Q. Scott, when that paragraph was read out loud to you on June 17, did you make any statements to Officer Taylor or Officer Darland?
    A. Yes, I did.
    Q. Relate to the Court what those statements were and how they came about.
    A. When Detective Taylor read the part that I don't want a lawyer I stopped him and told him—I said: I'm thinking I will need a lawyer.
    Q. You said I think I'll be needing a lawyer?
    A. Yes.
    Q. What was Detective Taylor's response to that statement?
    A. He told me not to worry about it; I could take care of that later.

    Q. When he said that, Scott, what did you think and what was your mental process at that point in time?
    A. I thought they were just doing this to figure out for their own what happened and my statement wouldn't hurt me later. (Tr. Hearing May 12, pp. 16–17).

2. *Maglio v. Jago,* 580 F.2d 202 (6th Cir.1974); *U.S. v. Clark,* 499 F.2d 802 (4th Cir.1974); *Thompson v. Wainwright,* 601 F.2d 768 (5th Cir.1979); *White v. Finkbeiner,* 611 F.2d 186 (7th Cir.1979); *U.S. v. Prestigiacomo,* 504 F.Supp. 681 (E.D.N.Y.1981); and *U.S. v. Hinckley,* 672 F.2d 115 (D.C.App.1982).

3. The transcript reads in pertinent part as follows:

    Q. (Mr. Moss) Now, when you said I think I'll be needing a lawyer; why was that?
    A. (Appellant) Because I thought I'd be needing a lawyer.
    Q. When did you think you'd be needing a lawyer?
    A. After spending all day in the cell.
    Q. What did you think you needed the lawyer for?
    A. To defend me.
    Q. Did you request Officer Taylor at that time to get you a lawyer or notify somebody you wanted a lawyer?
    A. No, sir.
    Q. Is that what you meant by that?
    A. That I was asking them to get me a lawyer?
    Q. Yes.
    A. No, sir.
    Q. That was not a request to Detective Taylor for him to secure a lawyer, a public defender or whatever was it at that time?

is substantiated by the fact that the appellant subsequently signed the waiver of rights form. See generally, *Lee v. State*, 560 P.2d 226 (Okl.Cr.1977). Moreover, upon being returned to his cell following the initial interrogation, the appellant expressed a desire to communicate further with the detectives; was again given a Miranda warning; and made subsequent statements which were more incriminating than the first. See, *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).[4]

In light of the above, we do not believe the appellant's statements were obtained in violation of his sixth amendment right to counsel.

### B.

In support of his contention that his statements were coerced and involuntary, the appellant points to "psychological terror tactics" employed by investigating officers; the fact that he was arraigned in Tulsa on June 19, approximately 52½ hours after his initial arrest; and that he was not allowed to make a telephone call within six hours of his incarceration, in violation of 59 O.S. 1981, § 1338. He argues these factors render the present case indistinguishable from *Haynes v. Washington*, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963). However, we do not find the circumstances surrounding the incarceration and interrogation of

the appellant to have been violative of the appellant's rights as they were in *Haynes*.[5]

■ In this case, even though the appellant was held for approximately 52½ hours before he was arraigned, he has failed to demonstrate any resulting prejudice. Mere delay between the time of arrest and arraignment, without a showing by the accused of prejudice resulting therefrom, is insufficient to raise an inference that a confession obtained during that time was involuntary. See, *Stidham v. State*, 507 P.2d 1312 (Okl.Cr.1973); *Logan v. State*, 493 P.2d 842 (Okl.Cr.1972), and cases cited therein. Unlike the accused in *Haynes*, supra, the appellant was not held incommunicado between the times he was arrested and arraigned. He was permitted to talk to his mother at approximately 8:00 p.m. on the evening of his arrest. We do not believe that the fact that the appellant was denied a telephone call within the six hour period provided by 59 O.S.1981, § 1338, demonstrates coercion or prejudice to the appellant. We find it unfortunate that the Sand Springs Police failed to scrupulously follow the procedure outlined in the statutes, and do not encourage such noncompliance; but in light of the fact that the appellant desired to telephone his mother, not an attorney,[6] and indeed never requested an attorney,[7] we do not believe this contributed an atmosphere of coercion.

---

A. No, sir. (Tr. May 12 hearing pp. 24–25).

**4.** In *Edwards,* the Supreme Court stated that one who has previously asserted his right to counsel may be subject to further interrogation if the accused initiates further communication, exchanges or conversation with the authorities. In this case the appellant informed the authorities that he had "might as well tell the truth" after the first interrogation had ended.

**5.** The circumstances surrounding the defendant's confession in *Haynes,* which prompted the Supreme Court to reverse his conviction were that the defendant was held incommunicado for sixteen hours between the time of his arrest and his signing of a confession; that he several times requested to call his attorney and his wife; that the police refused to allow him to call unless and until he "cooperated" by signing a written confession; that even after the defendant had signed a written confession and

had a preliminary arraignment, he was denied contact with the outside world; and that he was held incommunicado a total of five or seven days after his arrest.

**6.** 59 O.S.1981, § 1338 provides that,

Each person arrested shall have an opportunity to use the telephone to call his *attorney and bondsman* before being placed in jail, or within six (6) hours thereafter. (Emphasis added).

**7.** See footnote, 3, supra. In addition, see generally *United States ex rel. Riley v. Franzen,* 653 F.2d 1153 (7th Cir.1981), cert. denied 454 U.S. 1067, 102 S.Ct. 617, 70 L.Ed.2d 602 (1981), wherein it was held that a juvenile's request to see his father was not tantamount to a request for an attorney.

■ We have reviewed the remarks alleged by the appellant to constitute "psychological terror tactics."[8] We do not believe these remarks were sufficient to evoke or coerce an involuntary confession from the appellant. Thus, in light of the above, we do not find that the fact the appellant made several statements during his incarceration to indicate they were coerced or involuntary.

### C.

Matters concerning the polygraph test of which the appellant complains were brought before the jury when, in the taped statement introduced into evidence, the interrogating officers stated, and the appellant agreed, that a polygraph test would be given. Additionally, pursuant to defense counsel's timely objections, the trial court instructed the prosecutor to convey through examination of one of the detectives that the polygraph test was an interrogation tool, and that none was actually given the appellant. The prosecutor complied.[9]

■ Citing numerous cases in which this Court has held the admission of testimony and results concerning polygraph tests to be improper, the appellant argues the references to the possible polygraph test rendered the entire taped statement inadmissible. We find the case of *Coughran v. State,* 565 P.2d 688 (Okl.Cr.1977) to be controlling in this case. Here, as in *Coughran,* no test was given, thus no results published to the jury. Furthermore, we find that the question asked the detective, and the answer given concerning the investigative use of polygraph examinations did not refer to the appellant's right to remain silent.

While we again emphasize that we do not condone the admission of testimony concerning polygraph tests, we find no prejudice resulting to the appellant to the brief references in this case, *Coughran,* supra.

### II.

The appellant's second allegation of error is that the trial court erroneously admitted into evidence the rifle used in the murder, shell casings from the rifle, photographs of the crime scene and a letter written by the appellant to the victim's wife (the woman with whom the appellant had been living).

### A.

■ The rifle and the shell casings were sitting on the couch beside the appellant when the police arrived at the appellant's apartment on the morning of the shootings. They were clearly visible and in plain view of the officers. The seizure was not error, and the evidence was properly introduced at trial. *Brown v. State,* 644 P.2d 566 (Okl.Cr. 1982); *Tucker v. State,* 620 P.2d 1314 (Okl. Cr.1980).

■ The photographs of which the appellant complains are those taken of the appellant's apartment shortly after the police arrived and secured the scene. A police officer testified that they fairly and accurately depicted the murder scene as they found it. Admission of the photographs into evidence was not error. *Pate v. State,* 361 P.2d 1086 (Okl.Cr.1961).

### B.

■ Shortly after the appellant's arrest, a policeman conducted a warrantless search

---

8. The remarks complained of by the appellant were that he would go to "Big Mac"; that he was fortunate Oklahoma had no death penalty; and that his statements were "bullshit."

9. THE COURT:
   Might be advisable that the district attorney attempt to ask as few questions as possible but get across to this jury it was an interrogation tool, there was no ploygraph [sic] so they wouldn't be wondering whether there was or why haven't we been told the results since the Court made rulings admitting the

tape, that decision made in front of the jury, the objections to States 20 will be overruled. (Tr. 221).

\*     \*     \*     \*     \*     \*

PROSECUTOR:
Q. In your questioning you made reference to a polygraph, that would be fair to say that is investigative, an interrogative type question, not forcing him to do so?
WITNESS:
A. I couldn't force him to do so at all. (Tr. 223).

of a notebook found lying on the table in the kitchen of the appellant's apartment. The officer discovered a letter written by the appellant to the woman with whom he had been living which stated in part, "I'm begging for Earl (the victim) to mess with me. I'm a big boy now and I can handle him one way or another."

The appellant's motion to suppress the letter was sustained at the preliminary hearing, at which time the State gave notice of intent to appeal the decision to this Court, pursuant to 22 O.S.1981, ch. 18, App. Rule 6 et seq. That appeal was never perfected. Subsequently, at trial, the woman with whom the appellant had been living testified that she had read the letter in question several days prior to the shooting. The trial court admitted the letter, over the appellant's objections on the basis of the woman's independent sponsorship.

The appellant now complains that the trial court erroneously admitted the letter because it was illegally obtained; and furthermore, that the State's failure to appeal the adverse ruling at preliminary hearing resulted in the order suppressing the letter becoming a final order, thereby preventing introduction of the letter into evidence under any theory.

We do not agree with either contention. We are convinced that the trial court correctly permitted the State to introduce the letter. The Supreme Court stated in *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) that;

> We need not hold that all evidence is 'fruit of the poisonous tree' simply be-

cause it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' (Citation omitted). 371 U.S. at 487–88, 83 S.Ct. at 417.

The fact that the witness had previously read the letter, coupled with her prior testimony that the appellant had threatened to kill the victim at least two weeks prior to the murder; amply demonstrates that the introduction of the letter based on her testimony did not constitute "exploitation" of the illegal seizure, and that her sponsorship was purged of the "primary taint." *Wong Sun,* supra.

### III.

In the appellant's third assignment of error, it is argued that A) the trial court erroneously excused two veniremen for cause during voir dire examination; B) the trial court erroneously refused to instruct the jury on Second Degree Manslaughter; and C) the bailiff improperly communicated with the jury through his nonverbal acts.

### A.

The two veniremen who were excluded by the trial court expressed that they would have difficulty sitting as jurors on the appellant's trial, because of age similarities or past personal experiences.[10] The

10. The dialogue pertaining to the excusal of the first venireman was as follows:

> THE COURT:
> Do any of you have reservations, morals, religious, philosophical, that would prevent you from considering imposing a sentence of life in this case or any term or imprisonment in the State penitentiary?
> Ms. Tatom?
> MS. TATOM: I don't think I can handle a decision. I just don't think I have any business on this case at all.
> THE COURT: Is it the matter of life imprisonment we are talking about, punishment in general?

MS. TATOM: The whole thing in general. I'm a recent widow and I only have one son which is fairly close to his age. I don't feel I should be here at all.
THE COURT: Do you feel you should be excused for those reasons?
MS. TATOM: Yes, sir, I do.
THE COURT: You can be excused. (Tr. 26). The dialogue relating to the excusal of the second venireman was:
> THE COURT: Does anybody else think they might have any problem in this matter affixing and assessing punishment?
> MS. JACKSON: Yes, I don't feel that I could decide on guilt. I don't think in myself I

statements made by the two veniremen clearly demonstrate they would have had difficulty in reaching the issue of the appellant's guilt or innocence due to considerations beyond that of potential punishment. Thus, we do not believe the appellant's arguments based on the philosophy of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) are applicable in this case. The trial court did not abuse its discretion in excusing them, *Lewis v. State,* 586 P.2d 81 (Okl.Cr.1978); 22 O.S.1981, § 659.

### B.

In his argument that the trial court should have given the jury a second degree manslaughter instruction, he offers three alternative theories, based on the testimony of the medical examiner, the details of which we need not delineate here.

■ We need only note that the appellant's only defense at trial was that he intentionally fired the weapon at the victim in self-defense. The appellant introduced a photograph of the victim to demonstrate the disparity in size between the victim and himself, the statements given the police indicate the appellant claimed he was acting in self-defense, and counsel devoted considerable time in his opening and closing statements to that theory. In a case such

as this, where the evidence demonstrates that the appellant intended to shoot at the victim, we cannot say that the evidence supports a second degree manslaughter instruction based on negligence. See, *Cowles v. State,* 636 P.2d 342 (Okl.Cr.1981). The instruction was properly refused.

### C.

■ The appellant lastly complains that it came to his attention during the jury deliberations in this case, and has been subsequently confirmed by his independent personal inquiry and observation, that many bailiffs attempt to influence which juror becomes foreman of the jury by initially handing that juror exhibits throughout the trial. He asserts that such a practice occurred in the present case, and that the person whom the bailiff attempted to get selected was indeed chosen foreman. He argues that such an activity constituted improper "non-verbal" communication with the jury, and resulted in undue emphasis by the jury on the opinion of the "preselected" juror.

The appellant admits that no cases on this point are to be found, but argues that it was nonetheless improper. We are convinced that, even assuming the appellant's allegation concerning this matter in this case to be true,[11] no prejudice has been

could decide his innocence or guilt and punishment.

THE COURT: Do you understand that first of all you have got fellow jurors, eleven of them, that are going to deliberate with you, although every juror has to make their own decision, it is a matter of group deliberation. You've got rules and guidelines that the Court will give you on the law. Do you think in spite of that that you feel you couldn't sit as a completely fair and impartial juror in this case, Ms. Jackson?

MS. JACKSON: He's about the same age as I am and looks familiar to me. I can't figure out where I've seen him before. I don't feel I could.

THE COURT: You are asking me to excuse you?

MS. JACKSON: Please.

MR. SALISBURY: May we approach the bench?

(Whereupon the following was had at the bench out of the hearing of the jury.)

MR. SALISBURY: For the record, at this time, I will object to the excusing of the juror Jackson on the grounds that it's the right of the juror to have beliefs and compulsions internal to themselves to where they might find it difficult to sentence. The question becomes nevertheless could she sentence inspite of her internal feelings. I would believe that the juror would be excused in error and object to the excusing of that juror.

THE COURT: The objection is noted. (Tr. 28–29).

11. Since the appellant failed to subpoena the bailiff who allegedly committed the act, this Court is left only to the unsupported allegation of the appellant's attorney. We have previously expressed our reluctance to accept unsupported assertions of defense counsel in similar situations. See, *Smith v. State,* 659 P.2d 330 (Okl.Cr.1983).

shown to have occurred therefrom. The assignment of error is without merit.

The judgment and sentence is AFFIRMED.

CORNISH and BRETT, JJ., concur.