Frankie Lee JACOBSON, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–82–577.

Court of Criminal Appeals of Oklahoma.

June 21, 1984.

A.L.R.3d 14.

Opio Toure, Asst. Appellate Public Defender, Norman, for appellant.

Michael C. Turpen, Atty. Gen. of Oklahoma, Thomas L. Spencer, Asst. Atty. Gen., Oklahoma City, for appellee.

## OPINION

BUSSEY, Presiding Judge:

The appellant, Frankie Lee Jacobson, was convicted of Second Degree Murder, After Former Conviction of Two Felonies, in Muskogee County District Court, Case No. CRF-81-503, was sentenced to fifty (50) years' imprisonment, and he appeals.

On October 24, 1981, the body of Maxine Goforth was found floating in the Arkansas River near Muskogee, wrapped in a green comforter. A brown electrical cord flecked with white paint was tied tightly through the mouth as a gag and also around her neck; another piece of the same cord bound her feet, while her hands were tied behind her with red shoelaces. A laceration which was approximately one inch in length and about a quarter of an inch deep, was present on the back of the victim's head.

The appellant had been employed by Goforth as an apprentice barber and had done various household repairs for her over a period of several years.

During the course of their investigation, Muskogee police officers went to the Jacobsons' house and were given consent to enter and search by his wife, who signed a waiver of consent to search form. Between the living and dining rooms, two blood-soaked patches were found. In a small storage building behind the residence, a pole lamp with approximately a foot of brown electrical cord with specks of white paint on it was discovered. Additionally, a blood soaked towel was found in a trash can behind the Jacobsons' residence. The blood of the victim and the blood on the stained areas and the towel were both type "O". Upon inquiry by officers regarding a green bedspread and red shoelaces, Mrs. Jacobson responded that such a bedspread was indeed missing and the red shoelaces from one of her daughter's roller skates could not be found.

Melbajo Butler, the appellant's next door neighbor, testified that she heard a woman cry out about 1:30 p.m. on October 21, 1981.

Dr. Mohammed F. Merchant, of the chief medical examiner's office, testified that the scalp laceration to the victim severed no major arteries, that there was no evidence of a skull fracture, and that the wound was not such as to have caused death. It was his opinion, due to the presence of petechial hemorrhages in the throat area (larynx and epiglottis) and hemorrhaging present in the strap muscle of the neck, that the cause of death was manual strangulation.

The appellant testified on his own behalf regarding his past and related that he had dropped out of high school and joined the Army; he spent about 2½ years in Vietnam and had seen considerable combat action; he returned to Muskogee and had worked for and with the victim as a barber.

He stated that the pair had become intimately involved despite the fact that Goforth was more than 20 years his senior. He told the jury that he had borrowed $675 from Goforth and repaid $175 in cash and had worked on her car for three days; however, she was unsatisfied and, in addition, wanted him to roof an apartment

house to repay the debt, which he refused to do, maintaining that he had other debts that needed his attention and the value of the roofing job was between $1,600 and $2,000. On the date in question, Goforth came to his home demanding payment of the debt and threatening to expose their relationship to the appellant's newest wife, his third, and to whom he had been married for a little over a month. Further, when Goforth pointed a finger at him, Jacobson admittedly pushed her and she hit her head on an exposed door hinge. She was knocked unconscious and began to bleed profusely, so, according to the appellant, he put ice in a towel and placed it on the wound. Goforth regained consciousness in about 10 minutes and told the appellant "It's all right, Frankie, It's all right, Frankie"; but she then screamed, grabbed her head and passed out again, landing about a foot from where she had originally been. Jacobson applied a second towel with ice for about 10 minutes more but when he checked her pulse, as he had been trained by the Army to do, he determined that she was dead.

Appellant felt he could not call the police so he put the body in the green blanket and, although he had difficulty keeping the arms and legs in the blanket, took it to the shed behind the house. With a length of cord from a lamp, he bound her feet and, with a red shoelace from his daughter's roller skates, he also bound her hands. To keep his children from discovering the body, he drove to a department store and purchased a lock to keep the shed secured; he left Goforth's car in the store's parking lot with the keys in it and walked home.

In an attempt to divert attention from him, the appellant cut a piece of cord from a lamp in his bedroom and used it as a gag on the body. Later that evening, he took the body and threw it into the river. He stated he thought that Goforth had bled to death.

## I.

In one of his assignments of error, the appellant asserts that the trial court com-

mitted reversible error by admitting into evidence fruits of an illegal arrest, because the State failed to prove sufficient probable cause to make a warrantless arrest.

■ It has long been held that the test for the validity of a warrantless arrest is:

"Whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information was sufficient to warrant a prudent man in believing that the petitioner [arrestee] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). One does not have probable cause unless he had information of facts which, if submitted to a magistrate, would require issuance of an arrest warrant. Mere suspicion is not enough. *Mallory v. United States*, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957).

*Greene v. State*, 508 P.2d 1095 (Okl.Cr. 1973).

■ The facts and circumstances in the instant case are such that a prudent man would believe that Jacobson committed the crime. His wife voluntarily consented to police entering and searching the couples' home. The officers found two patches of blood soaked carpet between the living room and dining room and a towel saturated with blood in their trash can. Further, Mrs. Jacobson informed the officers that one red shoelace from her daughter's skates was missing, and a green bedspread was also gone. Additionally, in the small shed in back of the house, a pole lamp was found with all but about one foot of brown cord, flecked with white paint, cut off. These facts were ample to allow the officers to make a valid warrantless arrest of the appellant. Jacobson's statements to police, in the first of which he stated that after Goforth had regained consciousness he grabbed her, pinned her to the floor and then bound her, were properly admitted as a product of a valid warrantless arrest. This assignment of error is without merit.

## II.

In another assignment of error, the appellant maintains that his sixth amendment right to counsel was violated, and a statement that was taken following his alleged request for an attorney should not have been admitted at trial. We do not agree.

■ The record before us reveals that, after the appellant had been advised of his rights and given the *Miranda* warnings, which he stated he understood and signed a written waiver of rights form, Detective Allen Simmons asked him, "Why did you kill Mrs. Goforth?" (Tr. 257). After a moment's silence, Jacobson responded, "I think I need an attorney." Questioning by the police ceased and a cigarette and a cup of coffee were provided the appellant. Although a telephone was an "arms length" distance from him on a table, (Tr. 258) Jacobson did not use it. Appellant soon stated, "Well, I might as well just talk to you." (Tr. 258) Police questioning commenced anew, but was halted in order for a tape recorder to be procured to record the interview. With the appellant's knowledge, a tape recording of the inquiry was made.

For purposes of this opinion, we need not decide whether or not the appellant's statement, "I think I need an attorney" was an actual invocation of his right to counsel as we did in our recent decision styled *Kaposci v. State*, 668 P.2d 1157 (Okl.Cr.1983). As, in a recent opinion, a divided Supreme Court of the United States has dealt with the issue of waiver of the right to counsel. See, *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983).

After reviewing the facts in the case before us, it appears that the appellant "initiated" further conversation regarding the subject matter of the investigation with the police after questioning had ceased; consequently, the conversation should not have been excluded from evidence under *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). It also appears, under the totality of the circumstances, that the appellant's waiver of his right to counsel was voluntarily, knowingly and intelligently entered without any coer-cion by the police. The two pronged test advocated by Justices Rehnquist, Burger, White and O'Conner in *Oregon v. Bradshaw*, supra, was met in the instant case. We are of the opinion that, even if he had "unequivocally requested" an attorney, the appellant waived his right to counsel; accordingly, this assignment of error is without merit.

## III.

■ Next, the appellant contends that the trial court committed reversible error by admitting three photographs which were prejudicial and had no probative value. The photographs showed the victim's bound hands, feet and mouth, respectively. Appellant concedes that the admission of photographs and other evidence rests within the sound discretion of the trial court. *Grizzle v. State*, 559 P.2d 474 (Okl.Cr. 1977). As we have stated on numerous occasions:

> The rule is that admissibility of demonstrative evidence such as photographs is a question of legal relevance for the trial court. When the probative value is not outweighed by the danger of prejudice to the defendant, the photographs are admissible. *Assadollah v. State*, 632 P.2d 1215 (Okl.Cr.1981), citing *Oxendine v. State*, 335 P.2d 940 (Okl.Cr.1958).

The photographs in the case before us were not overly gruesome and they corroborated the testimony of several witnesses regarding how the victim was bound with the paint-flecked electrical cord and especially how she was gagged. We hold that the trial court did not abuse its discretion in admitting the photographs; this assignment of error is without merit.

## IV.

■ Appellant next asserts that prosecutorial comments in the closing argument were so prejudicial and inflammatory that he was deprived of a fair trial and reversal of his conviction is necessary. The record reflects that at trial only one objection was made to the remarks of which the appellant now complains, and no admonition was re-

quested for the single objected to comment. We have held on numerous occasions that when an objectionable statement is made by the prosecuting attorney it should be called to the attention of the trial court by timely objection, together with a request that the jury be instructed to disregard the improper statement. See for instance, *Blades v. State*, 619 P.2d 875 (Okl.Cr.1979), cert. den. 449 U.S. 845, 101 S.Ct. 129, 66 L.Ed.2d 54 (1980). In the instant case, because defense counsel failed to object to the comments complained of, error, if any, was waived. Moreover, even if the comments had been properly preserved, they were not such as to have swayed the verdict of the jury. This assignment of error is without merit.

## V.

Jacobson also assigns as reversible error the trial court's refusal to instruct the jury on insanity as a defense. He argues that he suffered from "posttraumatic stress disorder," present among veterans of the Vietnam conflict. Mitchell Townsend, who counsels veterans, testified that the disorder could affect a person's ability to distinguish between right and wrong, but he had never met Jacobson and could not express an opinion as to Jacobson's ability to discern right from wrong. Additionally, Dennis Keeley, a supervisor with the Veterans Administration, testified that the V.A.'s records reflected that Jacobson had been treated for "nerves" and "acute anxiety"; Patsy Moore, the Director of the State Department of Mental Health in Muskogee, stated that records of the Department showed that Jacobson had sought aid from the Department. Mariott Fowler, a social worker with the Department of Mental Health, related that she had interviewed Jacobson about a year and a half before Goforth's death and that her report shows that he was depressed and contemplating suicide at that time. None of the above witnesses expressed an opinion as to Jacobson's ability to distinguish right from wrong on the day the victim died. Further, the appellant does not assert that he was incapable of distinguishing right from wrong at the time of Goforth's death; rather, he merely claims that he did not know "what was all going on" or "what to do." (Appellant's Brief p. 17).

It is true, as the appellant points out, that the *M'Naghten* test of legal sanity is followed in our jurisdiction and the question for determination is whether a person is capable of knowing right from wrong at the time of the commission of the act. See, 21 O.S.1981, § 152(4). It is also true that, if the defense is insanity, it is the defendant's burden to raise a reasonable doubt as to his sanity, since the presumption is that the defendant was sane at the time of the crime with which he is charged. See, *Richardson v. State*, 569 P.2d 1018 (Okl.Cr.1977). From the facts presently before us, we are of the opinion that there was insufficient evidence presented to rebut the presumption of the appellant's sanity. See, *Frazier v. State*, 654 P.2d 639 (Okl.Cr.1982); and *Johnson v. State*, 621 P.2d 1162 (Okl.Cr.1981). Accordingly, the trial court properly refused to instruct on the defense of insanity as there was "no independent evidence ... presented tending to prove insanity." This assignment of error is without merit.

## VI.

Lastly, the appellant complains that his sentence is excessive. The fifty (50) year sentence he received is within the statutory limits for Murder in the Second Degree, After Former Conviction of Two Felonies and it does not shock the conscience of this Court. See, *Baldwin v. State*, 596 P.2d 1269 (Okl.Cr.1979), and cases cited therein.

The judgment and sentence is AFFIRMED.

PARKS, J., concurs in results.

BRETT, J., concurs.

PARKS, Judge, concurring in results:

I concur with the opinion as written, excepting the phrase, "under the totality of the circumstances," on page 560 thereof.